(No. 65579.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOHN W. LUCAS, Appellant.

*Opinion filed December 21, 1989.*

400

404

MILLER, J., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, and Allen H. Andrews, Assistant Defender, of the Officer of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Terence M. Madsen and Douglas K. Smith, Assistant Attorneys General, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

Following a jury trial in the circuit court of Vermilion County, the defendant, John Lucas, was convicted of four counts of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) and of concealment of a homicidal death (Ill. Rev. Stat. 1985, ch. 38, par. 9—3.1). The State requested a hearing to consider whether the death penalty should be

imposed. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(d).) The trial court, at a separate sentencing hearing, found the defendant to be eligible for the death penalty and found that there were no mitigating factors sufficient to preclude the imposition of a sentence of death. The circuit court sentenced the defendant to death and to a five-year term of imprisonment for the concealment of a homicidal death. The death sentence was stayed (107 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

Defendant raises 19 issues on appeal which, for ease of review, are grouped to reflect whether the issues relate to pretrial, trial or sentencing matters, or whether they concern constitutional questions. The issues which relate to the pretrial stage question whether the trial court erred in denying the defendant's motion to suppress when: (1) the defendant did not receive adequate *Miranda* warnings; and (2) the police failed to scrupulously honor the defendant's request to confer with counsel. Defendant raises nine issues concerning the conduct of the trial itself. Specifically, he questions: (1) whether he was denied a fair trial by an impartial jury when the trial court denied his motion for a change of venue; (2) whether the trial court improperly dismissed two venire members for cause; (3) whether evidence of his prior conduct towards the victim was improperly admitted; (4) whether the trial court improperly admitted evidence of his DUI conviction and of prior injuries suffered by the victim; (5) whether the trial court erred by denying his motion for a mistrial; (6) whether the State presented improper testimony during its case in rebuttal; (7) whether he was denied a fair trial as a result of remarks made by the prosecutor during closing argument; (8) whether the trial court abused its discretion by allowing the jury to view autopsy photographs; and (9) whether the murder and involuntary manslaughter instructions

given by the court denied the defendant a fair trial. Defendant's allegations of error at the sentencing phase concern: (1) whether the language of section 9—1(b)(7) of the Criminal Code of 1961 permits the arbitrary and capricious imposition of the death penalty; (2) whether the sentencing authority is required to make written findings of fact when imposing the death penalty pursuant to section 9—1(b)(7); (3) whether the trial court's finding that the defendant was eligible for the death penalty was supported by the evidence; (4) whether mitigating factors sufficient to preclude the imposition of the death penalty were present; and (5) whether the trial court erred in considering evidence of unadjudicated criminal conduct during the sentencing hearing. The defendant also presents various constitutional challenges to the Illinois death penalty statute, which, as we discuss below, we need not address.

While the record is extensive, we will summarize the portions relevant to our disposition of this matter. The following evidence was adduced at trial. At the time of the incident, the defendant was living with Shelly Carrigan and their seven-month-old son, Danny. On the evening of January 28, 1986, the defendant and Shelly Carrigan took Danny with them to a party. At the party, the defendant consumed beer, corn liquor, marijuana and amphetamines. The defendant, Shelly Carrigan and Danny left the party between 1:30 and 2 a.m. on January 29, 1986.

Shelly Carrigan testified that the defendant had been "pretty well drunk" and that when they arrived home, he was so intoxicated that she had to put him to bed.

The defendant testified that he could not remember leaving the party. However, he remembered going into Danny's room sometime that night and shaking Danny in his crib. In the process, he banged Danny against the

side of the crib. The defendant indicated that at the time he was aware that he was shaking Danny.

After shaking Danny, the defendant noticed that Danny had stopped breathing. In an effort to revive him, he splashed water on him and then placed him on the floor and performed cardiopulmonary resuscitation (CPR) on him.

The defendant then went back to bed. The next morning, unsure whether the events of the preceding night had actually occurred, he checked on Danny and discovered that he was dead. The defendant decided to hide Danny's body in the vicinity of Grape Creek, a wooded area not far from his residence. As he was leaving, he told Shelly Carrigan, who was still in bed, that he was going to get groceries. The defendant then dressed Danny's body, drove it to Grape Creek, and hid it under a pile of wood and debris.

After leaving Grape Creek, the defendant drove to an Eisner's grocery store, and went in briefly. He then drove home and told Shelly Carrigan that Danny had been kidnapped from his car at the Eisner's. The two drove back to Eisner's and called the police.

The police arrived at the Eisner's at approximately 10:15 a.m. The defendant and Shelly Carrigan were taken to the Public Safety Building, where they were questioned about the alleged kidnapping while the defendant's car was checked for evidence of the kidnapping. The defendant was initially questioned about the kidnapping by Investigators Miller and Hartshorn at 11 a.m. Based on certain inconsistencies in the defendant's story, they began to suspect his involvement in the incident; however, they did not place him under arrest. At 1:15 p.m., the police officers advised the defendant of his *Miranda* rights and again proceeded to question him about the alleged kidnapping. When the defendant indi-

cated that he would like to speak to an attorney, the officers ceased questioning and left the room.

Subsequently, the defendant's mother and brother came to the police station. The police informed them that they believed that the defendant was lying about the kidnapping and allowed them to speak to the defendant. The defendant's brother testified at trial that he and his mother were asked by the police to find out the truth regarding the child's disappearance. After talking to his mother and brother, the defendant decided that he did not need an attorney, that he would take a polygraph test, and that he would talk to the police.

While the defendant was at the Public Safety Building, the police obtained Shelly Carrigan's permission to search the house and car. The police obtained blood-stained bedding from Danny's room and took numerous photographs of the room.

The defendant was again interviewed at 7:43 p.m. on January 29, 1986, after he had submitted to a polygraph examination. After again being advised of his *Miranda* rights, he stated that he thought he had been involved in Danny's death and agreed to show the police where Danny's body was hidden. The defendant repeated his statements on tape at 7:53 p.m.

On January 30, 1986, at 10:23 a.m., the defendant told the police that on the evening of January 28, 1986, he had gone into Danny's room and had thrashed and banged Danny around in the crib. Once he realized that Danny was not breathing, he had attempted to revive him by performing CPR on him. He also stated that he had hidden the body at Grape Creek and later claimed that Danny had been kidnapped.

Dr. Maratos, the medical pathologist who performed an autopsy on Danny, testified that the cause of death was suffocation. He stated that Danny also suffered other injuries, the most significant of which were a frac-

tured left arm and a ruptured liver, and that the ruptured liver would have proved fatal had Danny not been suffocated. Dr. Maratos also testified that all of the injuries had occurred prior to Danny's death and that they could have been caused by someone holding Danny by his left arm and striking him against a solid object. Dr. Maratos described numerous autopsy photographs showing various aspects of the autopsy, several of which were submitted to the jurors during deliberations.

Thomas Miller and Richard Magers, friends of the defendant, testified at trial that they had been at the party with the defendant on January 28, 1986, and had seen the defendant drink beer and moonshine. Four or five marijuana cigarettes were passed around during the evening and were shared by most of the people at the party. At one point during the evening, Shelly Carrigan left the party for approximately half an hour. During her absence, Thomas Miller cared for Danny when he cried while the defendant continued to spend most of the evening drinking and playing cards.

The State also introduced evidence regarding a September 10, 1985, incident in which Danny sustained a broken arm while in the defendant's care. The defendant contended that Danny's arm had been broken when the defendant tripped and accidentally dropped Danny. Gordon Terry, an investigator from the Department of Children and Family Services (DCFS), testified that when he accused the defendant of breaking Danny's arm, the defendant laughed and stated that he could not prove it.

Shelly Carrigan testified at trial that her pregnancy caused her relationship with the defendant to deteriorate. As she paid more attention to the impending birth, she paid less attention to the defendant and, as a consequence, his drinking increased. Their relationship became so strained that she moved out prior to Danny's birth. The defendant first saw Danny several weeks after he

was born, and approximately one month after Danny's birth Shelly moved back with the defendant. She also testified that when Danny's arm was broken in September 1985, the defendant told her it had happened when he tripped over a cord and dropped Danny. She further stated that some time after Danny's arm was broken in September 1985, she saw the defendant shake and twist Danny while holding him by the left arm and right leg. When she asked the defendant what he was doing, he became very hostile and stated, "You make me do things like this."

The defendant presented a defense of voluntary intoxication. David Merritt, a counselor who had treated the defendant for alcoholism, testified on his behalf. He stated that the defendant suffered from blackouts, which he described as memory loss which prevented the defendant from remembering events that occurred while he was intoxicated. He also stated that based upon interviews with the defendant and from reviewing documents generated by others who had interviewed the defendant, he believed that the defendant was an alcoholic in the severe, fatal stage of chemical dependency.

In rebuttal, the State presented the testimony of Dr. Paul Haskin, a clinical psychologist who specializes in alcohol and drug rehabilitation. Dr. Haskin testified that blackouts, or alcohol-induced amnesia, can occur in anyone who ingests alcohol very rapidly. He stated that at a certain blood-alcohol level the brain does not register what is going on; "blackout" refers to that period of time.

The jury received instructions relative to the offense of murder, the lesser included offense of involuntary manslaughter and concealment of a homicidal death. The defendant was convicted of four counts of murder and concealment of a homicidal death. As the defendant had waived sentencing by a jury prior to trial, the sentencing

hearing was conducted by the trial judge. At the first phase of the bifurcated sentencing hearing, the trial judge found that the defendant had attained the age of 18 or more at the time of the incident, that the victim was under the age of 12 and that the death had resulted from exceptionally brutal or heinous behavior, indicative of wanton cruelty. (Ill. Rev. Stat. 1985, ch. 38, par. 9–1(b)(7).) Based on these findings, the court found the defendant to be eligible for the death penalty.

At the second phase of the sentencing hearing, the court heard evidence in aggravation and mitigation. In aggravation, the State introduced the testimony of the defendant's mother, who stated that the defendant had twice threatened her. The defendant's brother also testified that the defendant was violent when he was intoxicated, and a friend of the defendant testified that he had seen him wield a tire iron during a potential brawl. Shelly Carrigan testified that the defendant had beaten her.

In mitigation, the defendant presented extensive evidence that he was an alcoholic and a drug addict. His sister testified that he had been deeply affected by the untimely deaths of various friends and family members. Members of the sheriff's department testified that the defendant was a model prisoner.

The presentence investigation report revealed that the defendant did not have a juvenile record and that he had never been convicted of a felony. He had, however, been convicted of shoplifting, illegal transportation of alcohol, and eight traffic offenses, including one for driving under the influence of alcohol. The trial court found that there were no mitigating factors sufficient to preclude the imposition of the death penalty and sentenced the defendant to death.

## PRETRIAL

Prior to trial, the defendant filed a motion to suppress certain statements and evidence, claiming that the police had violated his *Miranda* rights (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602) by not advising him that he had a right to the presence of court-appointed counsel during questioning and by continuing to interrogate him after he requested an attorney.

At the hearing on the motion to suppress, it was established that at approximately 11 a.m. on January 29, 1986, the defendant was brought to the Public Safety Building to give a statement regarding the alleged kidnapping of his son. After the initial questioning the defendant chose to remain in the building, and at 1:15 p.m. he was interviewed a second time. During this second interview, the defendant was advised of his *Miranda* rights. The defendant initially waived his rights and agreed to answer some questions and to submit to a polygraph test. However, at some point during questioning the defendant stated "maybe I better get a lawyer" or words to that effect. The police immediately ceased questioning the defendant and exited the interrogation room, leaving the defendant behind.

Later that afternoon, the defendant's mother and brother arrived at the Public Safety Building. They were informed by the officers that the police did not believe the defendant's story about the kidnapping and were permitted to speak to the defendant. The defendant's mother and brother both urged him to waive the presence of an attorney and to take a polygraph test. After speaking to his family, the defendant informed the police that he did not desire an attorney and that he would take the polygraph test. At approximately 7 p.m. that evening, the defendant signed a consent form and took a

polygraph test. At approximately 7:43 p.m., after the defendant was again advised of his *Miranda* rights, the defendant admitted his involvement in Danny's death and agreed to show the police where Danny's body was hidden. At approximately 7:53 p.m. he made the same statements on tape.

The defendant argues that his incriminating statements were inadmissible at trial because they were obtained in violation of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. He maintains that he was in custody when he was interrogated at 1:15 p.m. and that his *Miranda* rights had attached at that time. He claims that, in violation of *Miranda*, the police did not cease their interrogation once he requested to speak to an attorney but, rather, continued to interrogate him by using his mother and brother as their agents. Since his mother and brother were acting in consort with the police, the defendant claims, his subsequent waiver of his *Miranda* rights was invalid and all of his statements should have been suppressed.

The rules of *Miranda* apply to admissions made by a defendant while he is in custody " 'or otherwise deprived of his freedom of action in any significant way.' " (*People v. Wipfler* (1977), 68 Ill. 2d 158, 168, quoting *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612.) In determining whether statements were made in a custodial setting, a court must consider all of the circumstances surrounding the questioning including the location, time, length, mood and mode of the interrogation, the number of police officers present, the presence or absence of family and friends of the accused, any indicia of formal arrest, any evidence of restraint, and the age, intelligence and mental makeup of the accused. (*People v. Savory* (1982), 105 Ill. App. 3d 1023, 1028; see also *People v. Burris* (1971), 49 Ill. 2d 98, 102-03.) After examining these factors, the court must make an objective

determination as to " 'what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes.' " *Wipfler*, 68 Ill. 2d at 166, quoting *Hicks v. United States* (D.C. Cir. 1967), 382 F.2d 158, 161.

In the present case, the trial court found that the defendant was not in custody at 1:15 p.m. and, consequently, *Miranda* was inapplicable. We agree with this assessment.

The record indicates that the defendant accompanied the police to the Public Safety Building voluntarily. He was first questioned at 11 a.m. for 30 to 40 minutes regarding his son's alleged kidnapping. At 1:15 p.m. the defendant was advised of his *Miranda* rights and questioned a second time regarding his son's disappearance. The interview took place in one of the rooms in which all witnesses are questioned; the room was not locked, and the defendant was free to move around. The evidence does not indicate that he was treated differently than other witnesses or that he was at the Public Safety Building for anything other than general questioning regarding his son's alleged kidnapping. Although the officers testified that they had noted certain discrepancies in the defendant's account of the kidnapping, the defendant had not been arrested, booked, fingerprinted or physically restrained at 1:15 p.m. and had not been told that he had to remain in the building. In fact, when the defendant agreed to take the polygraph test at approximately 2:30 p.m., he was informed that he could wait for the examiner at the Public Safety Building or leave and return at 7 p.m. It was not until approximately 7:43 p.m., when the defendant indicated that he was responsible for his son's death, that the officers indicated that the defendant would not have been free to leave and the interrogation became custodial.

Based on these facts, we believe that a reasonable man would not have believed that he was in custody at 1:15 p.m. The fact that the defendant was advised of his *Miranda* rights at 1:15 p.m. does not, in and of itself, create a custodial situation (*Wipfler*, 68 Ill. 2d at 170-71) since it is clear that the first time he was advised of those rights the defendant was not "deprived of his freedom of action in any significant way." (See *Miranda*, 384 U. S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612.) Accordingly, we agree with the trial court's finding that the defendant was not in custody at 1:15 p.m.

Moreover, even if we were to assume that the interrogation at 1:15 p.m. was custodial, we do not believe that the defendant's *Miranda* rights were violated. According to the record, once the defendant indicated a desire to speak with counsel, the police ceased their interrogation and did not communicate with him about the case until the defendant himself initiated contact and informed them that he would waive his right to an attorney and take the polygraph test. The defendant's argument that the police reinitiated interrogation through his mother and brother is without merit. The defendant's mother and brother came to the Public Safety Building of their own accord. Both the officers and Mrs. Lucas testified that the police had not requested or suggested that they convince the defendant to speak to them without an attorney. We do not believe that the defendant's brother's statement that "[the police] wanted to know if we would go talk to him to see if we could find out what—you know, what actually happened" establishes complicity with the police. So long as the police have not incited or coached family members to prompt a confession, the fact that the defendant chose to speak to the police after conferring with family members does not make his waiver invalid. (See *People v. Whitehead* (1987), 116 Ill. 2d 425, 436-40.) Accordingly, we find that

the defendant's statements were freely and voluntarily given without any subterfuge or compelling influence.

The defendant also contends that his *Miranda* warnings were deficient because, although the officers informed him that an attorney would be appointed for him if he could not afford one, he was not told that he could have appointed counsel present prior to and during questioning.

This contention is not supported by the record. Investigator Hartshorn testified that each time the defendant was advised of his rights, he was told that an attorney would be appointed for him at no cost to him if he could not afford one. On the taped statement made at 7:53 p.m. on January 29, 1986, the defendant acknowledged that he knew he had a right to have an attorney present *during questioning*, and that he voluntarily waived that right. Furthermore, the fact that the defendant requested the presence of an attorney at the 1:15 p.m. interview belies his argument that he was not aware that he had the right to have counsel present during questioning. Accordingly, we find that the defendant received adequate *Miranda* warnings, and that his waiver of those rights was knowing and voluntary. For these reasons we hold that the trial court did not err in denying the defendant's motion to suppress.

## TRIAL

The defendant next argues that the circuit court improperly denied his motion for a change of venue. Defendant contends that the fact that 19 potential jurors had to be excused because they had already formed an opinion as to the defendant's guilt or innocence illustrates that prejudicial publicity about the incident in his county was pervasive, and supports his argument that he did not receive a fair trial by an impartial jury.

The State responds that the fact that venire members with preformed opinions were detected and excused during *voir dire* indicates that biased members were removed from the panel and that the jurors who were selected were impartial and uninfluenced by the pretrial publicity. During *voir dire*, each prospective juror who was ultimately selected stated that he or she was either unfamiliar with the case, or had heard of it only generally. Each juror stated that he or she could disregard anything previously heard or read, and that he or she had not formed an opinion as to guilt. The State also points out that when the entire jury was selected, the defendant was given an additional opportunity to challenge individual jurors. He did not challenge any of the jurors for cause, nor did he exercise any of his 14 remaining peremptory challenges on the jurors of whom he now complains.

A motion for a change of venue must be granted only when " 'there are reasonable grounds to believe that the prejudice alleged actually exists and that by reason of the prejudice there is a reasonable apprehension that the accused cannot receive a fair and impartial trial.' " (*People v. Whitehead* (1987), 116 Ill. 2d 425, 440, quoting *People v. Berry* (1967), 37 Ill. 2d 329, 331.) The jurors who are ultimately chosen need not be "totally ignorant of the facts and issues involved" (*Irvin v. Dowd* (1961), 366 U.S. 717, 722, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1642); they must, however, be able to lay aside their opinions and decide the case on the evidence presented at trial (*People v. Lego* (1987), 116 Ill. 2d 323, 335; *People v. Speck* (1968), 41 Ill. 2d 177, 184, *rev'd & remanded on other grounds* (1971), 403 U.S. 946, 29 L. Ed. 2d 855, 91 S. Ct. 2279).

After examining the *voir dire* proceedings, we do not believe that the jury was biased by pretrial reports of the incident. As previously noted, *voir dire* revealed that

none of the jurors had specific knowledge about the case or had formed opinions as to the defendant's guilt. The fact that 19 venire members were excused for cause because they had been influenced by the pretrial publicity does not affect our determination. The relevant inquiry is "not the amount of publicity in a particular case, but whether the defendant in that case received a fair and impartial trial." (*Speck*, 41 Ill. 2d at 183.) Considering the entire record, we conclude that, while there was some publicity attendant to the incident, the defendant received a fair trial from an impartial jury and that he was not prejudiced by the denial of his motion for a change of venue.

Defendant next contends that he was denied a fair trial when the trial court improperly excused two venire members for cause. During *voir dire*, the trial court inquired of venireperson H\*\*\* whether she could follow the law as instructed, to which she replied that she could, provided it did not involve the death penalty. The trial court, over the defendant's objection, announced its intention to question venireperson H\*\*\* to determine whether her feelings regarding the death penalty would affect her ability to objectively determine the defendant's guilt or innocence. (See *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770.) The court indicated that should she be chosen to serve on the jury, the court would have to *Witherspoon* the entire venire, including the jurors previously selected, to ensure that there were no jurors with scruples against the death penalty. Alternatively, if venireperson H\*\*\* were excused, the court stated that it would also excuse venireperson L\*\*\*, another member of the venire who had heard the comment. In Witherspooning venireperson H\*\*\*, the following colloquy ensued:

"THE COURT: Is it your belief that John Lucas will automatically be sentenced to death if the jury convicts him of murder?

JUROR H***: No. (Shakes head back and forth.)

THE COURT: Is it your belief that John Lucas will not receive the death penalty if the jury convicts him of murder?

JUROR H***: Now phrase that again?

THE COURT: Is it your belief that John Lucas will not or may not receive the death penalty?

JUROR H***: No, I haven't come to no [sic] conclusion—

THE COURT: Okay.

JUROR H***: —either way.

THE COURT: Is it your belief that the jury will be called upon to decide the question of death if you convict him of murder?

JUROR H***: It—Someone mentioned yesterday that—just mentioned that if a death penalty was—could they do it, and I hadn't ever given it a thought until last night, and I really thought about it. I thought if somebody—

THE COURT: Do you believe this may be your responsibility?

JUROR H***: If somebody—If you would ask me to impose the death penalty, I couldn't do it.

THE COURT: My question is, though, do you think that's going to be something you are going to have to do?

JUROR H***: No, I am not saying that, but it was just— (Shakes head back and forth) I wanted to be honest—

THE COURT: Yes.

JUROR H***: —that I hadn't ever really thought about it that much until last night.

THE COURT: Will your beliefs concerning the possible penalties make it difficult for you to judge this case on the question of guilt or innocence?

JUROR H***: No, (shakes head back and forth) I don't have any problem of [sic] guilt or innocence.

\* \* \*

" THE COURT: Is it your position, ma'am, that in the event the defendant were convicted of murder in this cause, and it was your responsibility to follow the instructions of the Court with regard to determining whether or not he should receive the death penalty, that you could, under no circumstances, vote for that penalty—

JUROR H\*\*\*: I couldn't vote for the death penalty.

THE COURT: —you could not vote for the death penalty?

JUROR H\*\*\*: Life imprisonment, but not the death penalty."

After this exchange, the court excused both prospective jurors for cause, explaining on the record that it was doing so not because they could not follow the instructions of the court, but rather to prevent them from informing the other jurors that the death sentence was a possible penalty.

Defendant maintains that the court's ruling was improper for two reasons. First, he contends that by excusing venireperson H\*\*\* for cause the trial court violated the holding in *Witherspoon* which prohibits the exclusion of venire members for cause in capital cases based on their views regarding the death penalty unless their stated opposition to the death penalty would prevent or substantially impair the performance of their duties as jurors. (See *Witherspoon*, 391 U.S. at 521-23, 20 L. Ed. 2d at 784-85, 88 S. Ct. at 1776-77; *People v. Brisbon* (1989), 129 Ill. 2d 200, 224-25.) Since venireperson H\*\*\* had testified that her views on the death penalty would not interfere with her ability to determine the defendant's guilt or innocence, defendant claims she was not "*Witherspoon*-excludable." Second, defendant argues that since he had waived jury sentencing prior to trial, a juror's views regarding the death penalty were irrelevant, and the trial court had no reason to be concerned that, if selected, venireperson H\*\*\* or venireperson

L*** might mention the death penalty to the other jurors. We do not agree with either argument.

As to the first point, the record is clear that the trial court did not exclude these potential jurors because of their views on the death penalty but, rather, to avoid contamination of the venire. Thus, the *Witherspoon* rule is not applicable. As to defendant's second contention, the record indicates that the defendant had waived his right to a jury for the sentencing phase prior to trial specifically to preclude the State from death qualifying, or "Witherspooning," prospective jurors. (See *Daley v. Hett* (1986), 113 Ill. 2d 75, 82 (the State's right to question prospective jurors as to their views regarding the imposition of the death penalty as provided under *Witherspoon* does not come into effect when a defendant waives jury sentencing prior to trial).) The trial court recognized that were it to *Witherspoon* the entire venire, the defendant's purpose for waiving jury sentencing would have been defeated. However, the court also recognized that if either of the prospective jurors were placed on the panel, the issue of the death penalty could potentially be injected into deliberations. As none of the other jurors had been "Witherspooned," the court had no way of determining whether this factor would affect their determination of guilt or innocence. Thus, rather than prejudice either the defendant or the State, the court dismissed both prospective jurors for cause.

This court has long held that the determination of whether to remove a juror for cause rests within the sound discretion of the trial judge. (*People v. Hyche* (1979), 77 Ill. 2d 229, 239.) That determination is entitled to deference, and will not be disturbed on review absent an abuse of discretion. (*People v. Harris* (1967), 38 Ill. 2d 552, 556.) It is clear from the facts of this case that the trial court dismissed both prospective jurors in an effort to insure a fair trial and avoid possible preju-

dice to either the defendant or the State. Under these circumstances, we cannot say that it was an abuse of discretion to excuse the jurors for cause.

Next, defendant contends that he was denied a fair trial when the State elicited irrelevant and prejudicial testimony from Tom Miller, Richard Magers, Carol Newman, Shelly Carrigan, and the defendant himself in an effort to portray the defendant as a poor father. He maintains that this evidence was neither relevant to nor probative of his guilt, but was only intended to portray him as a distasteful human being.

At trial, Tom Miller testified that while they were at the party on January 28, 1986, when Danny cried, it was Miller, not the defendant, who attended to his needs and comforted him. Richard Magers, who was also at the party, similarly testified that Shelly Carrigan, not the defendant, cared for Danny and whenever Danny cried during Shelly's absence, Tom Miller, not the defendant, comforted him.

Carol Newman, a nurse employed with the Vermilion County health department, testified that on January 28, 1986, Shelly Carrigan and the defendant brought Danny in for DPT and polio immunizations. She stated that although she had seen Danny in a professional capacity four times prior to January 28, 1986, the defendant had not accompanied Danny on his visits until that date.

Shelly Carrigan testified that her pregnancy caused her relationship with the defendant to deteriorate as she paid more attention to the impending birth and less attention to the defendant. As a consequence, his drinking increased and their contacts became almost nonexistent. Once Danny was born, the defendant did not see him until he was two or three weeks old. Finally, she stated that prior to January 28, the defendant had not accompanied them to the Well-Baby clinic or to the doctor's office.

On cross-examination, the State questioned the defendant as to why he had not seen Shelly and Danny until several weeks after Danny was born; why Danny did not have his last name; who cared for Danny at the party; and his relationship with Shelly Carrigan.

The State argues that when defense counsel characterized the defendant as a loving father in his opening statement, he opened the door to evidence of the relationship between the defendant and the decedent. It maintains that this evidence is relevant to show intent and motive: intent in the sense that the defendant's prior acts are probative of the absence of accident (see, *e.g., People v. Manzella* (1973), 56 Ill. 2d 187 (evidence that the defendant had previously threatened and assaulted the victims was relevant to show criminal intent)), and motive in the sense that the prior acts tend to show that the defendant had a reason for killing the decedent (see, *e.g., People v. Stewart* (1984), 105 Ill. 2d 22 (evidence that the decedent had previously turned the defendant in to the police is relevant to establish motive)). We agree.

Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without such evidence. (See *People v. Johnson* (1986), 114 Ill. 2d 170, 193; *People v. Monroe* (1977), 66 Ill. 2d 317, 322 (adopting Fed. R. Evid. 401).) Evidence which tends to establish that the accused had a motive for killing the decedent is relevant, and if the evidence, at least to a slight degree, tends to establish the motive relied on, it is also competent. *Stewart*, 105 Ill. 2d at 56; *People v. Branion* (1970), 47 Ill. 2d 70, 77.

We believe the preceding evidence is both relevant and competent to establish motive. Throughout the trial, the defendant claimed that the decedent's death was unintentional. The State attempted to show, however, that

the defendant in fact resented the decedent for coming between him and the decedent's mother, Shelly Carrigan, and that this resentment in part motivated him to kill Danny. Thus, evidence of the defendant's relationship both with the decedent and Shelly Carrigan is probative of whether Danny's death was accidental or intentional, and is therefore admissible. The fact that this evidence may be prejudicial does not render it inadmissible. See *People v. Foster* (1979), 76 Ill. 2d 365, 374.

A related issue is whether the trial court erred in admitting evidence of two other instances in which the defendant allegedly abused the decedent. The first incident of alleged abuse occurred in September 1985, when Danny sustained a broken arm while in the defendant's care. The defendant maintained that the arm was broken when he dropped Danny. Dr. Mohan Jahm, a radiologist, testified at trial that the break sustained by Danny in 1985 was of the same type as the one Danny suffered on the date of his death.

The second incident occurred subsequent to the September 1985 break. Shelly Carrigan testified that, after having an argument with the defendant, she had seen him shaking and twisting Danny while holding him by an arm and a leg. She had informed the defendant's mother about the incident and Mrs. Lucas called DCFS.

Florence Lucas testified that Shelly Carrigan had told her about the twisting incident and that several days later she had called DCFS.

Gordon Terry, the DCFS investigator assigned to the case, testified that when he interviewed Shelly Carrigan about the incident in which the defendant had allegedly twisted the decedent by an arm and a leg, she denied that it had occurred. The defendant similarly denied that the twisting incident had occurred. Terry further stated that when he accused the defendant of breaking Danny's

arm in September 1985, the defendant laughed and said, "yeah, but you can't prove it."

Defendant objects to these statements on the basis that they were introduced only to establish his propensity to abuse the decedent.

Generally, evidence of prior acts and offenses may not be introduced to show propensity to commit crime. (*People v. Bartall* (1983), 98 Ill. 2d 294, 309-10.) However, evidence of other crimes is admissible if it tends to prove *modus operandi*, design, motive or knowledge. (*People v. Shum* (1987), 117 Ill. 2d 317, 352; *People v. McKibbins* (1983), 96 Ill. 2d 176, 182; see also M. Graham, Cleary & Graham's Handbook of Illinois Evidence §404.5, at 163 (4th ed. 1984).) In fact, evidence of other offenses is admissible if relevant for any purpose other than to show propensity to commit crime. *People v. King* (1986), 109 Ill. 2d 514, 530; *People v. Dewey* (1969), 42 Ill. 2d 148, 157; see also M. Graham, Cleary & Graham's Handbook of Illinois Evidence §404.5, at 163 (4th ed. 1984).

In the case before us, the defendant's involvement in the decedent's death was established by his own testimony. However, the defendant claimed that he did not have the intent to kill or cause great bodily harm to Danny. Evidence that the defendant was involved in prior incidents in which the decedent suffered similar injuries was admissible to show the presence of intent and the absence of accident. The evidence was relevant for a purpose other than to show the defendant's propensity to commit crime, and was therefore admissible. See *McKibbins*, 96 Ill. 2d at 186; *Dewey*, 42 Ill. 2d at 157.

The defendant objects to Florence Lucas' testimony on the additional grounds that it was improperly admitted as a prior consistent statement. He contends that evidence of prior consistent statements is admissible only to refute a charge of recent fabrication and, in this case, the defense had never contended that Shelly Carrigan

had fabricated her statement that she informed Florence Lucas about the twisting incident.

The record indicates, however, that Florence Lucas' testimony was admitted as a foundation for Gordon Terry's testimony, not as a prior consistent statement. Evidence which is admissible for one purpose cannot be excluded for the reason that it would not be admissible for another purpose. (*People v. Monroe* (1977), 66 Ill. 2d 317, 323.) Thus, while it may not have been admissible as a prior consistent statement, we find no error in the admission of that testimony for foundational purposes.

The defendant also contends that he was improperly precluded from impeaching Gordon Terry's account of his conversation with the defendant. The defendant sought to show, through the written report of a co-worker, that the defendant had stated "you can't prove it" rather than "yeah, but you can't prove it" in response to Terry's accusation that he had broken Danny's arm. Defendant's attempt to impeach Terry with a written statement of a co-worker was improper.

Defendant also objects to evidence elicited by the State on its cross-examination of the defendant regarding the fact that he had been arrested for driving while intoxicated in 1982. We note, however, that the defendant did not object to this testimony at trial and did not raise the issue in a post-trial motion. As both a trial objection and a written post-trial motion are required to preserve alleged trial errors, we find that the issue has been waived. See *People v. Enoch* (1988), 122 Ill. 2d 176, 186.

Next, the defendant contends that his due process rights were violated when a witness made reference to the fact that he had requested to speak to an attorney after being advised of his *Miranda* rights.

The record establishes that while the defendant's mother, Florence Lucas, was being questioned by the as-

sistant State's Attorney, the following colloquy took place:

"EXAMINATION BY [ASSISTANT STATE'S ATTORNEY]:

Q. Now, after you—was that the only conversation you had with John then?

A. No. The investigators had told me that John had asked for a lawyer.

Q. Okay."

At this point defense counsel objected and requested a side bar. Outside of the hearing of the jury, defense counsel objected to further testimony on the subject and moved for a mistrial. He indicated, however, that he did not want the testimony stricken or a curative instruction to be given; this was to avoid drawing attention to the statement. The court sustained the objection, but denied the defendant's motion for a mistrial on the bases that the statement had not been elicited by the prosecutor but had been volunteered by the witness and that the defendant had not been prejudiced by the comment. The witness was then instructed, outside of the jury's presence, not to make any more references to the fact that the defendant had requested an attorney.

The defendant now argues that this remark violated his due process rights under *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, and that it was error for the trial court not to grant a mistrial. We do not agree.

In *Doyle*, the Supreme Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." (*Doyle*, 426 U.S. at 619, 49 L. Ed. 2d at 98, 96 S. Ct. at 2245.) Although the present case differs from *Doyle* in that the reference was to the defendant's request to speak to an attorney rather than his post-arrest

silence, we find the situation to be similar, as both the right to remain silent and the right to an attorney are guaranteed under *Miranda.* The Supreme Court noted in *Doyle* that "while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (*Doyle,* 426 U.S. at 618, 49 L. Ed. 2d at 98, 96 S. Ct. at 2245.) We find that the same reasoning can be applied to the defendant's request to speak to an attorney and hold that a defendant's request to confer with counsel similarly cannot be used for impeachment purposes at trial.

In *People v. Miller* (1983), 96 Ill. 2d 385, *aff'd* (1987), 483 U.S. 756, 97 L. Ed. 2d 618, 107 S. Ct. 3102, this court considered the issue of when a *Doyle* violation does not constitute reversible error. In *Miller,* the prosecutor made a single reference to the defendant's post-arrest silence. The jury was instructed to disregard the question and no other reference or argument regarding the silence occurred. Under these circumstances, and in light of the court's determination that the properly admitted evidence was sufficient to prove the defendant's guilt beyond a reasonable doubt, the reference was found to be harmless error. (*Miller,* 96 Ill. 2d at 396.) In affirming this court's decision, the Supreme Court noted that since the defendant's post-arrest silence was not submitted to the jury as evidence, no *Doyle* violation had occurred. *Miller,* 483 U.S. at 765, 97 L. Ed. 2d at 630, 107 S. Ct. at 3108.

Relying on *Miller,* we do not find that the facts in this case mandate reversal. In the case at bar, the improper reference was not made by the prosecutor but was volunteered by a witness. Immediately after the

statement was made, the court sustained the defendant's objection and instructed the witness to make no further references to the defendant's request for an attorney. The remark was not stricken and a curative instruction was not given based on defense counsel's indication that he did not want to draw attention to the statement. The record indicates that the prosecutor made no further reference to the defendant's request for an attorney and it was not argued as evidence. Based on these facts, and the overwhelming evidence of the defendant's guilt, we find that the reference was harmless.

Defendant's next contentions of error concern evidence admitted during the State's case on rebuttal. As part of its case on rebuttal, the State recalled Investigator Hartshorn and Investigator Miller, who testified that the defendant had not told them that he had ingested "white cross" pills at the party on January 28, 1986. The State introduced this testimony to rebut the defendant's testimony on direct examination that he had taken four or five "white cross" pills at the party. The defendant argues that this was not proper rebuttal evidence, since the defendant had admitted on cross-examination that he had not told the police that he had taken the pills.

We note from the record, however, that the defense did not object to either Investigator Hartshorn's or Investigator Miller's rebuttal testimony regarding the amphetamines. Unless incompetent testimony is objected to at the time of its admission, any objection to the testimony is waived. (*People v. Ross* (1968), 41 Ill. 2d 445, 462-63.) Accordingly, this issue will not be considered.

The State also introduced the testimony of Dr. Paul Haskin, a clinical psychologist specializing in alcohol and drug rehabilitation, who testified that a blackout, or alcohol-induced amnesia, does not indicate that the person suffering the blackout was incapable of acting knowingly

or voluntarily during the period which he later cannot remember. Defendant contends that this was improper rebuttal testimony because it did not contradict prior testimony regarding blackouts. He claims that in the guise of rebuttal evidence the State was actually presenting new evidence as to the defendant's mental state.

Evidence which would tend to "explain, repel, contradict or disprove the evidence of the defendant" is admissible in rebuttal even though such evidence would have been admissible as part of the State's case in chief. (*People v. Daugherty* (1969), 43 Ill. 2d 251, 255.) Although such evidence should not be reserved for rebuttal, these matters rest largely within the discretion of the trial court and such rulings ordinarily will not be set aside on review. *People v. Waller* (1977), 67 Ill. 2d 381, 387.

Applying these principles, we find Dr. Haskin's testimony to be particularly appropriate on rebuttal. During the defendant's case in chief, David Merritt, a certified addictions counselor who had treated the defendant for alcoholism, testified that the defendant suffered from blackouts. He described a "blackout" as a short-term memory loss and stated that an individual having a "blackout" is unable to recall anything that has taken place during a specific period of time. He further testified that blackouts differentiate social drinkers from chronic alcoholics. On rebuttal, Dr. Haskin testified that the term "blackout" is a misused term and the condition is actually alcohol amnesia, which results from the rapid ingestion of alcohol and the subsequent failure of the brain to register events once a certain alcohol level is reached. Dr. Haskin stated that while anyone who rapidly ingests alcohol could suffer from alcohol amnesia, the condition occurs more frequently in abusive drinkers because they tend to drink more rapidly than moderate drinkers. As it is clear that Dr. Haskin's testimony was introduced to explain and refute David Merritt's testi-

mony regarding blackouts, we find that it was properly admitted on rebuttal and will not disturb the trial court's ruling.

Defendant also contends that he was denied a fair trial as a result of various remarks made by the prosecutor in his closing argument. Defendant cites four different comments, only two of which drew objections. We note that where defense counsel does not object to the allegedly prejudicial remarks, any error would normally be waived unless the comments were so inflammatory that the defendant could not have received a fair trial, or so flagrant as to threaten deterioration of the judicial process. (*People v. Owens* (1984), 102 Ill. 2d 88, 104.) Accordingly we first examine the comments to which no objections were made to determine whether they were so prejudicial as to deny the defendant a fair trial.

First, the defendant claims that the prosecutor's argument that the defendant's only defense was voluntary intoxication precluded jury consideration of the lesser included offense of involuntary manslaughter. We disagree.

While voluntary intoxication is normally not a defense to the commission of a crime (*People v. Winters* (1963), 29 Ill. 2d 74, 80) evidence that the intoxication was so extreme as to suspend the power of reason may be used to negate the existence of the mental state which is an element of the crime. (*People v. Free* (1983), 94 Ill. 2d 378, 407-08; Ill. Rev. Stat. 1985, ch. 38, par. 3—2.) In the present case, the defendant attempted to establish that his intoxication was so severe that he could not form the mental state required to support a murder conviction. Contrary to the defendant's assertion, argument that he was too intoxicated to know or intend the consequences of his actions would not preclude consideration of the lesser included offense of involuntary manslaughter, but would in fact support it. Consequently, we cannot say that this argument was prejudicial.

Next, defendant argues that the prosecutor improperly commented about the victim's family when he stated that, because of the defendant's conduct, Shelly Carrigan was left with nothing and that Danny never had a chance to know the fishing hole where his body had been hidden.

This court has consistently condemned the admission of evidence that the deceased left a family or argument by the prosecution which dwells upon the decedent's family. (*People v. Jimerson* (1989), 127 Ill. 2d 12, 41; *People v. Hope* (1986), 116 Ill. 2d 265, 275; *People v. Bernette* (1964), 30 Ill. 2d 359, 371.) However, not every mention of a decedent's family necessarily entitles the defendant to a new trial, since, depending on how it is introduced, the evidence and argument may be harmless. *People v. Free* (1983), 94 Ill. 2d 378, 414; see, *e.g.*, *People v. Wilson* (1972), 51 Ill. 2d 302, 307 (where evidence concerning the decedent's family was more incidental than calculated and was not presented in such a manner as to cause the jury to believe it was material, reversal was not required).

In the present case, the objectionable comments were made in passing and the prosecutor did not dwell on them. Since the argument was presented incidentally and not in such a manner as to cause the jury to believe it was material, we find that the comments were harmless and do not warrant reversal of the defendant's convictions.

Having determined that the foregoing comments, to which no objections were made, were neither so inflammatory nor so flagrant as to deny the defendant a fair trial, we turn to the comments to which objections were made.

Defendant contends that the prosecutor's statement that the defense consisted solely of evidence of blackouts misstates the evidence. He maintains that this argument

misstated the facts because the defendant had presented other evidence of intoxication.

An examination of the State's closing argument indicates that while at one point the prosecutor did state that having blackouts is not a defense, he went on to argue that the other evidence presented by the defendant similarly did not establish a defense. We recognize that in analyzing the propriety of any statement, the statement must be considered in the context in which it was made (*People v. Turner* (1989), 128 Ill. 2d 540, 561), and having considered the prosecutor's statement in the context of the entire closing argument, we find that it was not a misstatement of the evidence.

Finally, the defendant objects to the prosecutor's statements that he "lived off" his mother and that he "lived off" women. Defendant argues now that the statements were sufficiently prejudicial to warrant reversal.

This court has consistently held that statements may not be made in closing arguments solely to arouse and inflame the passions of the jury. (*People v. Johnson* (1987), 119 Ill. 2d 119, 139; *People v. Terry* (1984), 99 Ill. 2d 508, 517.) However, improper remarks made during closing argument generally do not constitute reversible error unless they result in substantial prejudice to the accused. *People v. Caballero* (1989), 126 Ill. 2d 248, 273; *People v. Baptist* (1979), 76 Ill. 2d 19, 29.

In the present case, we agree with the defendant that the prosecutor's remarks that the defendant "lived off" various individuals bore no relevance to his guilt or innocence and were improper. However, we note that the court recognized that these references were improper, and sustained the defendant's objections to these statements. Furthermore, the jury was specifically instructed that closing arguments are not evidence and that they should disregard any argument not based on the evi-

dence. In view of these admonitions, and the substantial evidence of the defendant's guilt, we cannot say that these remarks either constituted a material factor in the defendant's convictions or otherwise prevented him from receiving a fair trial (see *People v. Johnson* (1986), 114 Ill. 2d 170, 199). Consequently, we find that they do not warrant reversal of the defendant's convictions.

The defendant next argues that the trial court abused its discretion by permitting the jury to consider, during its deliberation, certain photographs of the decedent taken in the autopsy room. He contends that any probative value the photographs may have had was outweighed by their gruesomeness and that they were calculated only to prejudice and inflame the jury.

The record indicates that the jury was permitted to view Exhibits 37, 38, 40, 45 and 46. Exhibits 37, 38, 40 and 46 are 8-inch by 10-inch color photographs; Exhibit 45 is a 5-inch by 7-inch color photograph. Exhibit 37 shows a bruise to the decedent's head. The photograph depicts an incision through the scalp to the skull and the decedent's empty chest cavity can be seen at the bottom of the photograph.

Exhibit 38 depicts the decedent after his scalp was dissected and retracted. The decedent's skin was cut from ear to ear and retracted over his face to reveal a hematoma. The decedent's empty chest cavity is also visible in the photograph.

Exhibit 40 depicts the decedent cut open from throat to groin. His skin has been retracted to display his rib cage and his internal organs. The photograph also depicts Dr. Maratos' hand holding the left lobe of the decedent's liver.

Exhibit 45 shows a close up of the decedent's liver held by forceps.

Exhibit 46 depicts Dr. Maratos' hand holding the decedent's left lung. The decedent's rib cage has been cracked open and various other organs are exposed.

The State justifies the admission of the photographs on the ground that they depict the nature and extent of the decedent's injuries. It contends that Exhibits 37 and 38 were necessary to illustrate the hematoma on the head; Exhibits 40, 45 and 46 were necessary to show the abdominal injuries and were probative of the force used to inflict the injuries.

Under the present standard for admissibility of photographic evidence, photographs that are relevant to establish any fact in issue are admissible in spite of the fact that they may be of a gruesome or disgusting nature. (*People v. Foster* (1979), 76 Ill. 2d 365, 377.) The responsibility of weighing the probative value and potentially prejudicial effect of the photographs rests with the trial judge, and his decision as to which evidentiary items should be taken into the jury room will not be disturbed absent a clear showing of abuse. *People v. Shum* (1987), 117 Ill. 2d 317, 353.

Clearly, the photographs in question may be perceived as gruesome. However, as they are probative of the extent and severity of the decedent's injuries, we cannot say that the decision to submit them to the jury was an abuse of discretion.

The next issue is whether the trial court properly instructed the jury as to the correct burden of proof on the involuntary manslaughter charge. Relying upon *People v. Reddick* (1988), 123 Ill. 2d 184, the defendant contends that the instructions given in the present case erroneously state the burden of proof on the issue of whether the defendant acted in a reckless manner.

In *Reddick*, the jury received instructions on both murder and voluntary manslaughter. The murder instruction required that the State prove that the defend-

ant performed acts which caused the decedent's death and that, when he performed those acts, he knew that they created a strong probability of death or great bodily harm to the decedent. The voluntary manslaughter instructions given to the jury in *Reddick* required that the State prove that the defendant performed acts which caused the decedent's death and that when he did so, he knew that the acts created a strong probability of death or great bodily harm, but that in causing such death, he was acting out of either intense passion or under the unreasonable belief that his acts were justified. This court held:

> "[T]he instructions \*\*\*, when read together, erroneously state the burdens of proof on the issues of whether the defendants acted under either intense passions or unreasonable beliefs that their actions were justified. The voluntary manslaughter instructions indicate that to obtain a voluntary manslaughter conviction the People must prove the existence of one of the alternative mitigating mental conditions which the People contend did not exist. By contrast, the murder instruction makes no mention of the mitigating mental conditions. These instructions essentially assure that, if the jury follows them, the jury cannot possibly convict a defendant of voluntary manslaughter. The reason is that even if a mitigating mental state is proved, it will have been proved by the defendant, not the People." (*Reddick*, 123 Ill. 2d at 194-95.)

This court treated proof of unreasonable belief or heat of passion as an affirmative defense to the murder charge; once a defendant produced enough evidence to put the defense in issue, the burden shifted to the State to *disprove*, not prove, the mitigating mental conditions of voluntary manslaughter beyond a reasonable doubt. *Reddick*, 123 Ill. 2d at 197.

In the present case, the murder instructions submitted to the jury placed the burden on the State to prove, beyond a reasonable doubt, that the defendant per-

formed the acts which caused the decedent's death; that when the defendant did so, he intended to kill or do great bodily harm to the decedent (count I); that he knew his acts would kill or cause great bodily harm to the decedent (count II); that he knew his acts created a strong possibility of death or great bodily harm to the decedent (count III); or that he caused the death of the decedent while committing the offense of aggravated battery of a child (count IV).

The involuntary manslaughter instruction submitted to the jury, Illinois Pattern Instructions, Criminal, No. 7.08 (2d ed. 1981) (involuntary manslaughter), provides that to sustain a charge of involuntary manslaughter the State must prove, beyond a reasonable doubt, that the defendant performed the acts which caused the decedent's death; that the defendant performed those acts recklessly; and that those acts were likely to cause death or great bodily harm.

Defendant maintains that the same circumstances exist in the present case as in *Reddick*. He contends that since the State did not desire an involuntary manslaughter conviction, it would not introduce evidence that the defendant had acted recklessly. Since the involuntary manslaughter instruction requires that the State prove recklessness, any evidence presented by the defendant could have been disregarded by the jury. Thus, defendant contends that the jury should not have been instructed that the burden is on the State to prove recklessness but, rather, that the burden is on the State to disprove recklessness.

The State contends that this case is distinguishable from *Reddick*. It maintains that it does not have to disprove recklessness in order to establish the intent or knowledge necessary for a murder conviction because recklessness is not an affirmative defense to murder but, rather, a separate and distinct mental state. We agree.

In *Reddick*, this court treated unreasonable belief and heat of passion as affirmative defenses to the murder charge which had to be disproved by the State because, if present, they would lessen the defendant's culpability for his otherwise murderous conduct. In the present case, as the State correctly notes, recklessness is not a less culpable form of intent or knowledge. On the contrary, recklessness and knowledge are mutually inconsistent mental states. (*People v. Hoffer* (1985), 106 Ill. 2d 186, 195.) Since murder is an intentional or knowing killing (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) and involuntary manslaughter, by definition, is an unintentional killing (Ill. Rev. Stat. 1985, ch. 38, par. 9—3), where a determination is made that one exists (*i.e.*, an intentional killing), to be legally consistent, the other (*i.e.*, an unintentional killing) must be found not to exist (*Hoffer*, 106 Ill. 2d at 195; see also *People v. Spears* (1986), 112 Ill. 2d 396, 404). Accordingly, we find no error in the instructions given.

Defendant also contends that the involuntary manslaughter instruction prevented the jury from considering evidence in mitigation presented by the defendant. He maintains that since the involuntary manslaughter instruction required that the State prove recklessness, any evidence of recklessness presented by the defendant could be disregarded by the jury. We find this argument to be similarly without merit.

The record indicates that the defendant raised the defense of voluntary intoxication at trial. Voluntary intoxication is a defense to criminal conduct when the intoxication is so extreme as to suspend the power of reason and render the accused incapable of forming the specific intent which is an element of the offense with which he is charged. (Ill. Rev. Stat. 1985, ch. 38, par. 6—3.) Any evidence of intoxication must be considered by the trier of fact in determining whether the State has established

the requisite mental state for the offenses charged. In the present case, although the State has the burden of proving a reckless mental state to support a charge of involuntary manslaughter, it is clear that any evidence regarding the defendant's mental state presented by the defendant in refuting the charge would be considered by the jury. Consequently, we find no error in the involuntary manslaughter instruction.

For the reasons stated, we affirm the defendant's convictions.

## SENTENCING

Having determined that no reversible error occurred during the guilt phase of the defendant's trial, we now consider the alleged errors at the sentencing phase. Defendant first contends that his death sentence must be vacated because it was imposed under an unconstitutional provision of our Criminal Code, section 9—1(b)(7) (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(7)). Section 9—1(b)(7) provides that a defendant who has attained the age of 18 or more and who has been found guilty of first degree murder may be sentenced to death if:

> "the murdered individual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(7).)

Relying on *Maynard v. Cartwright* (1988), 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853, the defendant contends that the language "exceptionally brutal or heinous behavior" is so broad and subjective that it fails to properly guide a sentencer's discretion, and thereby results in an unreasoned and capricious imposition of the death penalty.

In *Maynard v. Cartwright* (1988), 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853, the Supreme Court held that an aggravating factor in the Oklahoma death pen-

alty statute was unconstitutionally vague, as applied to that defendant, because the language "especially heinous, atrocious, or cruel" failed to guide or limit the discretion of the sentencer. (*Maynard*, 486 U.S. at ___, 100 L. Ed. 2d at 379, 108 S. Ct. at 1857.) The defendant argues that the language in section 9—1(b)(7) is analogous to that in *Maynard*, and is similarly unconstitutionally vague.

This court considered the constitutionality of section 9—1(b)(7) in *People v. Odle* (1989), 128 Ill. 2d 111. In *Odle*, we held that section 9—1(b)(7) does not suffer from the same infirmities as the Oklahoma statute considered in *Maynard*, because it is much more specific in describing the conduct which qualifies an accused for the death penalty. (128 Ill. 2d at 140.) However, this court emphasized that while the statute is constitutional on its face, in order to be constitutional in application all of the qualifying requirements must be present: "the victim must be under the age of 12, and the conduct which brings about the victim's death must not only be exceptionally brutal or heinous, it must *also* be such that it is indicative of wanton cruelty." (Emphasis in original.) (*Odle*, 128 Ill. 2d at 141.) We find *Odle* to be controlling, and reject the defendant's contention that the language of section 9—1(b)(7) is unconstitutionally vague. See also *People v. Kidd* (1989), 129 Ill. 2d 432.

The defendant argues that even if section 9—1(b)(7) is valid on its face, his death sentence should nonetheless be reversed because section 9—1(b)(7) was unconstitutionally applied in his case because his conduct did not rise to the level of "exceptionally brutal or heinous" behavior. He further argues that since the circuit court made no express findings as to why the conduct involved was brutal or heinous, meaningful review of the sentence is impossible.

Defendant's argument that the lack of express findings results in an unreviewable sentence has previously been rejected by this court (see *People v. King* (1986), 109 Ill. 2d 514, 550-51; *People v. Brownell* (1980), 79 Ill. 2d 508, 544), and will not be reconsidered. As this court noted in *Brownell*, in each death penalty case the entire record undergoes scrutiny for errors and defects. The sentencing hearing is reviewed with the object of ascertaining whether any aggravating factors have been proven beyond a reasonable doubt and whether there are mitigating factors sufficient to preclude the imposition of the death sentence. *People v. Brownell*, 79 Ill. 2d at 543.

In accordance with this mandate, we consider whether the defendant's conduct was proven to be "exceptionally brutal or heinous" and "indicative of wanton cruelty." In *People v. La Pointe* (1981), 88 Ill. 2d 482, 499, this court rejected a vagueness challenge to identical language contained in section 5—8—1(a)(1)(b) of the Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—8—1(a)(1)(b)). The *La Pointe* court held that the phrase "exceptionally brutal or heinous behavior indicative of wanton cruelty" must be given its ordinary and popularly understood meaning (*La Pointe*, 88 Ill. 2d at 499-500) and defined "heinous" as being " 'hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal' "; "brutal" was held to mean " 'grossly ruthless, devoid of mercy or compassion: cruel and cold-blooded.' " (*La Pointe*, 88 Ill. 2d at 501, quoting Webster's Third New International Dictionary 1050, 286 (1971).) Cases in which this court has found brutal or heinous behavior to be present have generally involved prolonged pain, torture or premeditation. See, *e.g.*, *People v. Odle* (1988), 128 Ill. 2d 111 (where defendant strangled his 11-year-old brother with his hands and, when his hands became tired, finished murdering him by tying a pajama bottom around his neck until it was com-

pressed to the size of an adult man's wrist, his conduct was exceptionally brutal and heinous, indicative of wanton cruelty); *People v. Mitchell* (1984), 105 Ill. 2d 1 (where defendant repeatedly beat 16-month-old child with her hands, fists, and belt, standing the child back up to hit her again each time the child fell, conduct was exceptionally brutal or heinous and indicative of wanton cruelty).

The evidence in the present case indicates that the cause of the decedent's death was suffocation which occurred almost immediately after the injuries were inflicted. There was testimony that the injuries themselves could have been inflicted by a single blow. There is no conclusive evidence in the record to indicate that the decedent's death was either premeditated, prolonged or tortuous. Applying the above-mentioned principles, we cannot say that the circumstances surrounding the decedent's death were exceptionally brutal or heinous *and* indicative of wanton cruelty. Accordingly, we find that all of the qualifying requirements of section 9—1(b)(7) have not been met and, consequently, the defendant is not eligible for the death penalty under section 9—1(b)(7). As section 9—1(b)(7) was the sole statutory aggravating factor relied on in finding the defendant eligible for the death penalty, the defendant's death sentence is vacated and the cause is remanded to the circuit court of Vermilion County for the imposition of a sentence other than death.

Defendant raises a number of other challenges to his death sentence and to the Illinois death penalty statute itself. In light of our determination that he is not eligible for the death penalty, those arguments will not be considered. For the reasons stated above, the convictions are affirmed, but the death sentence is vacated and the cause remanded to the circuit court of Vermilion County

with directions to impose a sentence upon the defendant other than death.

*Convictions affirmed;*
*death sentence vacated;*
*cause remanded with directions.*

JUSTICE MILLER, concurring in part and dissenting in part:

I join the court in affirming the defendant's convictions. I do not agree, however, that the defendant's death sentence must be vacated, and accordingly I dissent from that portion of the majority opinion.

In the present case, the defendant's eligibility for the death sentence was predicated solely on the aggravating circumstance found in section 9—1(b)(7) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(7)). That provision authorizes imposition of the death penalty in cases in which "the murdered individual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." In *People v. Odle* (1988), 128 Ill. 2d 111, this court considered, on its own motion, whether section 9—1(b)(7) was unconstitutional in light of the Supreme Court's decision in *Maynard v. Cartwright* (1988), 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853. *Odle* ruled that the Illinois provision was valid. Discussing the requirements of the statute, the court emphasized: "the victim must be under the age of 12, and the conduct which brings about the victim's death must not only be exceptionally brutal or heinous, it must *also* be such that it is indicative of wanton cruelty." (Emphasis in original.) (*Odle,* 128 Ill. 2d at 141.) Recently we reaffirmed *Odle,* holding once again that section 9—1(b)(7) is not facially invalid. *People v. Kidd* (1989), 129 Ill. 2d 432, 454-56.

Relying on *Odle* and *Kidd,* the majority rejects the defendant's argument before this court that section 9—

1(b)(7) is unconstitutional on its face. The majority also rejects the defendant's related contention that the death sentence imposed in the present case was rendered unreviewable by the trial judge's failure to provide written findings, or some other express statement, regarding his application of the statutory aggravating circumstance. Having determined in *Odle* and *Kidd* that section 9—1(b)(7) is constitutional, the narrow question in this case is whether the sentencing judge properly found that the aggravating circumstance had been proved beyond a reasonable doubt. The majority agrees with the defendant that the provision was not established here.

In explicating the terms "brutal," "heinous," and "wanton cruelty," the majority turns to *People v. La Pointe* (1981), 88 Ill. 2d 482. That case considered identical language appearing in section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—8—1(a)(1)), which authorizes the imposition of a term of natural life imprisonment when the offense of murder is accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. Citing *Odle* and *People v. Mitchell* (1984), 105 Ill. 2d 1, which involved imposition of an extended term of imprisonment for the offense of aggravated battery of a child (see Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2(b)(2) (extended term may be imposed if felony "was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty")), the majority states, "Cases in which this court has found brutal or heinous behavior to be present have generally involved prolonged pain, torture or premeditation." (132 Ill. 2d at 445.) The majority concludes that the evidence in this case fails to support the trial judge's finding that the defendant's murder of the seven-month-old victim came within the scope of section 9—1(b)(7). In support of its holding the majority notes that the victim's death was caused by suffocation, "which oc-

curred almost immediately after the injuries were inflicted," and that there was testimony indicating that the injuries could have been the result of a single blow. The majority then states that there was no "conclusive evidence" that the victim's death was premeditated, prolonged, or torturous. 132 Ill. 2d at 446.

As noted, the majority declares that in cases involving exceptionally brutal or heinous behavior indicative of wanton cruelty, the conduct in question has generally involved prolonged pain, torture, or premeditation. The majority's formulation may be questioned. In *La Pointe* the court rejected the defendant's argument that behavior of the type described is found only in cases involving torture or the infliction of unnecessary pain; in reaching that conclusion, the court relied on the same definitions of the terms "heinous" and "brutal" that are cited by the majority here. (*La Pointe*, 88 Ill. 2d at 501.) Although the court in *La Pointe* went on to describe the offense committed in that case as premeditated, it cannot be said that the court intended for that observation to additionally restrict the application of those terms.

Assuming, however, that the majority is correct in its judgment that the statutory aggravating circumstance provided by section 9–1(b)(7) requires proof of prolonged pain, torture, or premeditation, I would conclude that the necessary conduct was shown here. The medical evidence introduced at the defendant's sentencing hearing established that the seven-month-old victim, Danny, was first struck against an object and then smothered; the cause of the child's death was determined to be suffocation. According to the pathologist who performed the autopsy, the victim had contusions around his mouth and nose, apparently resulting from suffocation. The child also had incurred a small hematoma on the upper chest, a hematoma on the head, a small contrecoup injury to the brain, a mild hemorrhage in the myocardium,

a hematoma in the left lung, and a bruised thymus. In addition to those injuries, the lobes of the child's liver had separated, and his left arm was broken. The pathologist believed that the defendant had swung the child's body into a hard object while holding him by the arm. Referring to Danny's broken arm, the pathologist explained:

> "That most probably, my opinion is that it was the pivotal point, that the baby was held up by the arm. And while to some extent the lower third of the humerus was held immobile, the body kept moving and came in contact with the hard surface, and this resulted in a fracture of the humerus and the injuries to the remaining body."

The force of the impact caused the child's liver to rupture. The defendant then smothered the victim, causing his death.

Although the child's suffering might not have been prolonged, it clearly was torturous. I note also the evidence suggesting that the defendant's conduct in the present case may have been premeditated, which would further support a finding under the standard formulated by the majority. Danny had previously suffered a broken arm while in the defendant's care, and other evidence indicated that the defendant resented the child. As the court correctly holds, the evidence of the defendant's prior conduct toward the victim was admissible at trial because it tended to show motive and intent. By the same token, that evidence suggests the deliberate, if not premeditated, nature of the defendant's behavior in causing the child's death. In light of the victim's age, the nature and extent of his injuries, and the defendant's conduct in causing the child's death, I would conclude that the requirements of section 9—1(b)(7) were satisfied here. Because I find no merit in the defendant's remaining contentions, I would affirm the sentences imposed, as well as the convictions.