(text box: 1) NO. 5-98-0657

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____________________________________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from the

)  Circuit Court of

     Plaintiff-Appellee, )  Williamson County.

)

)  No. 88-CF-162

)

RICHARD C. NITZ, )  Honorable 

)  John Speroni,

     Defendant-Appellant. )  Judge, presiding.

_____________________________________________________________________________________________

JUSTICE KUEHN delivered the opinion of the court:

At one time, Richard Nitz knew when he was to rendezvous with death, for the State of Illinois had set the appointed hour.  Death was to be Nitz's punishment for killing Michael Miley and mutilating his body.  However, his last meal was never served.

After losing his direct appeal, Nitz sought collateral relief from his conviction and death sentence, questioning his fitness to stand trial.  Nitz had ingested a psychotropic drug called Tranxene during the trial.  The drug had been administered to quell anxiety.  The trial had been conducted without a prior fitness hearing to determine the effect of the psychotropic medication on Nitz's mental well-being.  In the absence of a hearing, our high court presumed Nitz to be unfit because of the medication's use and found that the process to the verdict and death sentence had been constitutionally infirm.  
People v. Nitz
, 173 Ill. 2d 151, 670 N.E.2d 672 (1996).  It reversed the conviction, vacated the sentence, and ordered a new trial.

  The State prosecuted Nitz again for the same crime, but it did not charge Nitz in the same manner, and it did not seek capital punishment.  It charged three counts of first-degree murder.  Each count alleged that Nitz had shot Miley with a gun and thereby caused Miley's death.  The counts differed only in alleging different mind-sets under which Nitz had performed that act.  A Jackson County jury engaged in lengthy deliberations before arriving at its verdict.  It found that Nitz had not intended to kill Miley and that Nitz had no knowledge that shooting Miley would in fact cause Miley's death.  It acquitted Nitz on the two charges that called for those findings.  The jury returned a guilty verdict on a third count, finding that Nitz was aware of the fact that shooting Miley created a strong probability of death or great bodily harm.  Based upon the jury's finding of guilt and the trial judge's finding that this particular first-degree murder had been accompanied by brutal and heinous behavior indicative of wanton cruelty, the trial judge sentenced Nitz to imprisonment for the rest of his life.  Nitz appeals the verdict and sentence. 

The particular facts surrounding the offense for which Nitz was again convicted are recounted in detail by the Illinois Supreme Court in 
People v. Nitz
, 143 Ill. 2d 82, 572 N.E.2d 895 (1991).  We address only those limited facts necessary to an understanding of the legal issues raised on this appeal. 

Nitz challenges the validity of the verdict, based upon the following arguments: (1) that he was deprived of the constitutional right to testify in his own defense when the trial judge ruled that his testimony, if given, could be impeached with prior sworn testimony given during the first trial, (2) that jurors lied during 
voir dire 
and convicted him based upon knowledge of his earlier conviction and his failure to testify and that during 
voir dire
 the jury foreman lied about his impartiality and concealed his preconceived belief in Nitz's guilt, (3) that he was improperly prevented from presenting evidence of other possible suspects who might have murdered Miley, (4) that the jury should have been instructed on the offense of second-degree murder, and (5) that he was improperly prevented from impeaching certain State witnesses with evidence of their prior convictions.   

Nitz also challenges the validity of his sentence, based upon the following arguments: (1) that his conduct was not brutal or heinous behavior suggestive of wanton cruelty and therefore cannot support the judge's factual finding, (2) that the trial judge should have eased the sentence based upon certain evidence offered in mitigation, and finally, (3) that the receipt of a natural-life sentence based upon a factual finding not determined by a jury under a reasonable doubt standard violated his constitutional rights to due process, notice, and a trial by jury.  

For the following reasons, we affirm.   

The first argument is premised upon Nitz's absolute right to testify in his own defense.  He maintains that this right was taken from him when the trial judge ruled that the State could use his testimony from the first trial, provided that it proved to be inconsistent with testimony tendered at this second trial.  Nitz tried to bar the testimony's use, based upon his presumptive incompetence during the first trial.  He maintains that if an involuntary confession cannot be used for impeachment purposes, prior testimony from an incompetent defendant should not be used as well.  

We note that the foundation for this argument–Nitz's presumptive incompetence and his prior testimony's unreliability because of that fact–has fallen prey to a supreme court that has come full circle in its understanding of our fitness statute.  The same court that reversed Nitz's conviction, vacated his death sentence, and granted him a new trial because a fitness hearing had not been held no longer believes that the legislature intended to require one.  We now know what only three members of the supreme court knew in 1996 when Nitz was granted postconviction relief.  
People v. Nitz
, 173 Ill. 2d 151, 165, 670 N.E.2d 672, 678 (1996) (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.).  We cannot presume Nitz unfit simply because he was treated with Tranxene to manage anxiety disorders during the trial.  

The supreme court has entirely abandoned the legal basis for Nitz's earlier reprieve.  
People v. Mitchell
, 189 Ill. 2d 312, 328-31, 727 N.E.2d 254, 265-67 (2000).  Had the supreme court read our fitness statute in the same manner a few years ago, in all likelihood Nitz would be appealing in that undiscovered forum from whose bourn no traveler returns.

Nitz counters this legal turnabout with several arguments that pertain to the question of his actual fitness and his prior testimony's arguable unreliability, given the ingestion of mood-altering medication.  We need not address them.  Nitz was not deprived of the right to give testimony at his trial.  He was simply not afforded the luxury of doing so without challenge from earlier sworn testimony that 
might
 have proven to be inconsistent.  We have no way of knowing what prejudice, if any, resulted from the trial court's ruling.  Nitz did not testify at the trial.  We suspect that the choice was thrust upon him by virtue of the State's power to use prior testimony sharply at odds with what he wanted to say.  Notwithstanding, his choice to forego testifying, standing alone, cannot support the conclusion that he was prejudiced.  See 
People v. Benson
, 266 Ill. App. 3d 994, 1001-02, 641 N.E.2d 617, 623-24 (1994).  Without his testimony, we have no basis to review the question of trial court error.  As the Illinois Supreme Court has noted in an analogous context: 

"[D]efense counsel may not have it both ways by altering their trial strategy to make the best of the trial court's order, depriving the reviewing court of a reviewable record, and still maintain that the order was erroneously entered."  
People v. Whitehead
, 116 Ill. 2d 425, 443-44, 508 N.E.2d 687, 693 (1987).

Nothing in this record tells us what Nitz hoped to establish with his testimony or how the trial court's ruling erroneously impacted what he hoped to say.  Without a record, we can find no error in the trial court's ruling.

Nitz's second argument raises a specter of juror dishonesty and misconduct.  It touches directly upon the sanctity of the jury deliberation process.  It rests upon a juror's disavowal of her vote to convict, coupled with her assessment of the mental processes by which other jurors arrived at a guilty verdict, based upon comments they made during jury deliberations.   

Having lost his bid to prevent the State from using his prior testimony, Nitz's strategy to defend without testifying prompted a painstaking inquiry of prospective jurors about a defendant's right not to testify.  Apart from questions posed by defense counsel–questions designed to condition the jury to Nitz's forthcoming silence–the trial judge spoke to each juror about the right not to testify and determined that its exercise would not affect their outlook on the case.  In essence, the trial judge engaged in the same colloquy with each prospective juror, and each one answered in identical fashion.  Here is an example.

"Q.  You understand that Mr. Nitz does not have to testify or present any evidence?

A.  Yes.

Q.  That is a fundamental concept of our law.  Will you hold it against him if he chooses not to testify or to present any evidence?

A.  No."

Not one of the 12 jurors selected to serve was spared the inquiry.  Moreover, all the selected jurors assured the court, counsel, and Nitz that the absence of his testimony would not be considered in arriving at a verdict. 

Another topic of intense inquiry during 
voir dire
 was the extent to which each juror already possessed knowledge about the facts of the case.  Despite a venue change to minimize juror awareness of prior events, the earlier convictions of Nitz and his wife, Rita, were generally known to the prospective jurors.  Each member of the jury said that he or she would decide the case only on the facts and evidence presented at the trial and not on prior knowledge of the case.

[Nonpublishable material under Supreme Court Rule 23 (166 Ill. 2d R. 23) removed here.]

Joan Davis was one of the jurors selected.  She voted to return a guilty verdict and affirmed that vote in Nitz's presence when the jury was polled in open court.  Before the hearing on posttrial motions, she provided Nitz with a sworn affidavit that impeached her verdict and assailed the deliberations process.  The affidavit explained that Davis was one of four "hold out" jurors, a status she held by virtue of her belief that the State had failed to prove its case against Nitz.  According to Davis, she abandoned her sworn duty to Nitz because she felt pressured and believed what other jurors had told her about the sentence that would be imposed.  She threw her own beliefs to the wind, voted to convict someone who, in her mind, was not proven guilty, and affirmed that misconduct in open court, because she believed that Nitz would be sentenced to time served.    

The affidavit also addressed misconduct on the part of other jurors.  Davis set forth that jurors had commented about Nitz's failure to testify.  The jurors further commented that therefore Nitz must be guilty.  The affidavit also set forth that at least one juror commented that the jury had no choice but to convict, given the fact that Nitz had already been convicted.  The affidavit concluded with a statement that Davis was upset that "other jurors would consider the other trials, including Nitz's wife's trial results[,] and that they would consider the fact that Mr. Nitz didn't testify."

Based upon the affidavit, the trial judge was asked to award a new trial or, in the alternative, to conduct a hearing to determine if jurors had been dishonest in answering 
voir dire
 questions.  The trial judge expressed his belief that jurors had been forthright and honest in their responses to his questions, and the judge refused the request.  He found that the affidavit was an attempt to impeach the verdict by raising matters that involved the nature and process of jury deliberations.

Nitz now asks us for a new trial or, in the alternative, a remand to conduct a hearing on the possibility of juror perjury.

We adhere to the long-standing rule of law that the testimony of jurors will not be received to establish their own mistake or misconduct, to prove that of their fellows while in the jury room, or to otherwise impeach their own verdict.  See 
Phillips v. Town of Scales Mound
, 195 Ill. 353, 363-64, 63 N.E. 180, 184 (1902).  This certainly applies to juror Davis's revelation about her own misconduct, as well as to any misconduct engaged in by the other jurors.  Juror Davis may not testify about what transpired in the jury room as a means to impeach her verdict or the other jurors' verdict.  See 
Sanitary District v. Cullerton
, 147 Ill. 385, 390-92, 35 N.E. 723, 724-25 (1893).  

Nitz claims that this well-established rule of law, designed to protect the sanctity of jury verdicts, is not at issue.  He claims to invoke an exception to the rule.  He points to our acceptance of a verdict's challenge where it can be shown that a prospective juror testified falsely on 
voir dire
 and the testimony involved a matter of potential bias and prejudice.  See 
Hockett v. Dawdy
, 180 Ill. App. 3d 491, 497, 536 N.E.2d 84, 87 (1989).  Based upon this principle, he contends that the verdict was reached by jurors who had committed perjury when they said that a failure to testify would not be considered.  He also maintains that jurors committed perjury when they said that the verdict would be decided solely upon the facts and evidence presented at the trial.  It follows from this position that the affidavit was not really offered to impeach the verdict by way of a showing that jurors had engaged in misconduct during deliberations.  Rather, the affidavit was offered to impeach the verdict by showing how jurors had lied in answer to inquiries made during 
voir dire
. 

Although juror Davis believes that jurors used Nitz's earlier conviction and his failure to testify as bases to convict, we are not willing to accept her conclusion.  Juror Davis may well have heard improper comments during deliberations, but other than herself, she does not know and cannot say why any particular juror voted to convict.  While certain jurors may have expressed thoughts inconsistent with their charge, we would like to think that all the jurors, save juror Davis, voted their conscience based solely upon the facts and evidence submitted.  In any event, the content of the affidavit does not prove otherwise.  

More importantly, the exception carved out by 
Hockett v. Dawdy
 was designed to deal with circumstances where jurors consciously conceal facts about themselves that would expose a predisposition, bias, or prejudice detrimental to fair and open-minded thinking.  It was not designed to police the jury deliberations room for comments inconsistent with the instructions given and to later use those comments in order to maintain that jurors had failed to deliver on 
voir dire
 commitments to follow the law.  There is good reason jurors are asked about potential silence in the face of an accusation and are specifically instructed not to consider a defendant's silence.  We know that a mute defense is going to bother and trouble people, regardless of legal guarantees that allow for it.  We suspect that the comments juror Davis heard are not all that uncommon in the process of deliberations, despite all efforts to keep jurors from those thoughts.  Hopefully, when a juror points out that the defendant failed to testify, the comment upsets another juror who promptly points out the judge's instruction not to consider that fact.  In any event, we will not invite a massive attack on the sanctity of verdicts by allowing the use of comments made during jury deliberations to suggest that jurors did not perform their duty to follow the law or otherwise shirked some commitment to legal principle made during 
voir dire
.  Such an exception would engulf the rule.

Juror Davis explicates our view.  She told the judge and the parties during 
voir dire
 that she would decide the case solely upon the facts and evidence presented.  She also told them that if she did not believe that the evidence established guilt beyond a reasonable doubt, if she believed that the State failed to prove its case, she would find the defendant not guilty.  According to her, she did not do either.  Her decision was guided by a need to relieve herself of discomfort from peer pressure and a misadvised belief that she would not do Nitz much harm by abandoning her convictions.  If the statements she made on 
voir dire
 provided a basis to impeach the verdict and warranted a new trial, she, and any other juror, would be empowered to impeach a verdict by confessing misconduct.  The misconduct would simply have to be recast from the deliberations room back to the 
voir dire
 session where commitments to perform the duties of a juror were made.  

Nitz's request does not raise a question of juror dishonesty on a matter of bias or prejudice.  It constitutes an effort to impeach a jury verdict on matter that involves the nature and process of deliberations.  Jury verdicts should be, and will be, insulated from such attacks.    

[Nonpublishable material under Supreme Court Rule 23 removed here.]

The third argument deals with Nitz's attempt to introduce evidence of other suspects who might have committed the murder.  

Michael Miley was a homosexual.  There was evidence introduced by the State that tended to establish Nitz's homophobia.  The evidence helped to explain how Nitz might have made contact with Miley.  It also helped to explain why Nitz would kill Miley.  The defense wanted to show that others in the Carbondale area harbored the same hatred for homosexuals.  The trial court found that such evidence, without a showing that these other individuals were connected in some way with this crime, was too speculative.  We agree.  

A defendant may attempt to prove that someone else committed the crime for which he is charged, but that right is not without limitation.  
People v. Enis
, 139 Ill. 2d 264, 281, 564 N.E.2d 1155, 1161 (1990).  Such evidence is relevant and admissible only if a close connection can be demonstrated between someone else and the commission of the offense.  
People v. Wilson
, 271 Ill. App. 3d 943, 948, 649 N.E.2d 1377, 1382 (1995).  There must be some evidence from which to reasonably infer that a specific individual other than the defendant might have committed the crime.  Extraneous conduct not connected with the crime itself may not be shown.  
People v. Smith
, 122 Ill. App. 3d 609, 616, 461 N.E.2d 534, 539 (1984).  Evidentiary rulings of this sort rest within the sound discretion of the trial court, and this court will not reverse the trial court's decision absent a clear abuse of discretion.  
People v. Kidd
, 147 Ill. 2d 510, 535, 591 N.E.2d 431, 442 (1992).

We believe that the trial judge properly exercised his discretion in refusing to allow evidence that the Carbondale area harbored more than one bigot when it came to homosexuality.  Unfortunately, there is a wealth of bigotry and hatred in this world.  Proof of other homophobia lacks relevancy, for it does not tend to prove that someone else rather than Nitz committed the crime.  

Nitz targeted certain witnesses for the prosecution and wanted to present them as possible suspects.  He wanted to present random facts about those witnesses and to claim that those facts, coupled with shared homophobia, tended to make them legitimate suspects.  He wanted to prove that one of the State's witnesses was once married to a homosexual-hater and that two other witnesses, both homosexual-haters, were involved in a shooting incident the night before Miley's death.  These facts bear no connection to the murder.  They provide nothing from which to infer a link to Miley's death.  Their admission into evidence would have invited rank speculation.  See 
Smith
, 122 Ill. App. 3d at 616, 461 N.E.2d at 539.  

Although Nitz correctly asserts that "concrete" proof is not necessary, it is simply not enough to show that certain people who shared his homophobia fired a gun at someone else and for that reason might have killed Michael Miley.  Nitz had to be able to tie someone other than himself to the commission of the crime.  He had to be able to produce relevant evidence from which the jury could reasonably conclude that he had not committed the crime because someone else had.  The evidence did not have to prove someone else's guilt beyond a reasonable doubt.  It did not have to meet any burden.  However, it did have to meet the test of relevancy.  The proffered evidence fell short of meeting this test.  It never crossed that line that separates interesting speculation from reasonable inference.  Accordingly, the evidence was properly excluded and the trial court did not abuse its discretion in so ruling.

Next, Nitz quarrels with the trial judge's refusal to instruct on the offense of second-degree murder.  Nitz argues that the second-degree-murder instruction was warranted on the basis of evidence of mutual quarrel or combat.  The instruction should be given where there exists some evidence of serious provocation that, if believed by the jury, would reduce the crime to second-degree murder.  
People v. Kidd
, 295 Ill. App. 3d 160, 167, 692 N.E.2d 455, 460 (1998).  

A person commits second-degree murder when "[a]t the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed."  720 ILCS 5/9–2(a)(1) (West 1996).  "Serious provocation" is defined as "conduct sufficient to excite an intense passion in a reasonable person."  720 ILCS 5/9–2(b) (West 1996).  The defendant must be acting under a sudden and intense passion spurred from a serious provocation that the law recognizes as reasonable.  
People v. Garcia
, 165 Ill. 2d 409, 429, 651 N.E.2d 100, 110 (1995).  The only categories of provocation that courts recognize as sufficient to warrant a second-degree-murder instruction are mutual quarrel or combat, substantial physical injury or assault, illegal arrest, or adultery with one's spouse.  
Garcia
, 165 Ill. 2d at 429, 651 N.E.2d at 110.  Passion on behalf of the defendant, no matter how violent, will not relieve him of culpability for first-degree murder unless it is engendered by provocation that the law recognizes as reasonable.  
Garcia
, 165 Ill. 2d at 429, 651 N.E.2d at 110.  

Mutual quarrel or combat is defined as " 'a fight or struggle entered into by both parties willingly or by a mutual fight upon a sudden quarrel and in hot blood upon equal terms.' "  
People v. Jackson
, 304 Ill. App. 3d 883, 893, 711 N.E.2d 360, 368 (1999) (quoting 
People v. Rivera
, 255 Ill. App. 3d 1015, 1026, 627 N.E.2d 294, 301 (1993)).  The confrontation must be mutual, and the evidence must indicate that both the accused and the victim willingly participated in a fight.  
Jackson
, 304 Ill. App. 3d at 893, 711 N.E.2d at 368.  In addition, the evidence will not support a second-degree-murder instruction where there is provocation but the defendant's retaliation is not proportional.  
Jackson
, 304 Ill. App. 3d at 893, 711 N.E.2d at 368.

A defendant is entitled to an instruction on his theory of the case if there is some foundation in the evidence for the instruction, and if there is such evidence, it is an abuse of discretion for the trial court to refuse to so instruct the jury.  
People v. Jones
, 175 Ill. 2d 126, 131-32, 676 N.E.2d 646, 649 (1997).

We find that the trial court did not abuse its discretion in refusing to give Nitz's second-degree-murder instruction, because Nitz did not present sufficient evidence to warrant giving that instruction.  There is nothing in the evidence to establish that Nitz was acting under a sudden and intense passion resulting from serious provocation at the time he beat and killed Miley.  This was not mutual combat or quarrel as that term has been defined.  It was not a fight on equal terms.  

In an attempt to support his claim of mutual quarrel or combat, Nitz points to testimony that Miley followed him to his trailer, exited his car, and advanced to the steps of Nitz's front porch.  Nitz also points to the testimony of Michael Stearns, who testified that Nitz told him that he had killed a homosexual with whom he had a "run-in," and the testimony of Danny Walker, who testified that Nitz had told him that words had been exchanged before Nitz killed Miley.

Mere words, gestures, or trespasses to property do not constitute the kind of serious provocation contemplated by the statute.  
People v. Strader
, 278 Ill. App. 3d 876, 884, 663 N.E.2d 511, 516 (1996).  The evidence here shows that there had been no struggle with Miley prior to the time that Nitz struck him with a baseball bat, shot him in the head, and decapitated him.  The evidence shows that no more than words were exchanged.  No evidence was presented to show that Miley threatened Nitz, and even if the victim's act of following Nitz home could be viewed as provocation, Nitz's retaliation was not proportional.  The nature of the contact characterized by Nitz beating Miley with a baseball bat while Miley remained "unarmed" could hardly meet the definition of mutual combat, which envisions a fight or struggle on equal terms.  See 
Jackson
, 304 Ill. App. 3d at 894, 711 N.E.2d at 368.

Accordingly, under the facts of this case, no second-degree-murder instruction was warranted, and the trial court did not abuse its discretion by rejecting that instruction.

The fifth argument deals with the trial court's refusal to allow Nitz to impeach two of the State's witnesses with evidence of prior misconduct.    

Nitz wanted to impeach one of the witnesses with the fact that at the time of the trial she was on court supervision for deceptive practices.  He wanted to impeach the other witness with the fact that he had a prior felony conviction for possession of a stolen motor vehicle.

The State filed a motion 
in limine
 to prevent Nitz from presenting that evidence.  The trial court ruled that evidence of the deceptive-practices charge was not admissible because the disposition, court supervision, did not result in a conviction.  The trial court also ruled that the felony car-theft conviction was not admissible because the witness had been convicted and released from prison more than 10 years prior to giving his testimony.  

The law is well-settled that evidentiary rulings are within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion.  
People v. Reid
, 179 Ill. 2d 297, 313, 688 N.E.2d 1156, 1164 (1997).

When a person is placed on court supervision, the court defers further proceedings in the case and defers entering a judgment on the charge until the conclusion of the supervision period.  730 ILCS 5/5–6–3.1(a), (d) (West 1996).  "At the conclusion of the period of supervision, if the court determines that the defendant has successfully complied with all of the conditions of supervision, the court shall discharge the defendant and enter a judgment dismissing the charges."  730 ILCS 5/5–6–3.1(e) (West 1996).  A discharge and dismissal upon a successful conclusion of a disposition of supervision shall be deemed to be without an adjudication of guilt and will not be termed a conviction.  730 ILCS 5/5–6–3.1(f) (West 1996).  Thus, until a person either successfully completes supervision or violates one or more of the conditions, she remains in much the same position as one who had merely been arrested or charged with a crime.  The law is clear that proof of arrests, indictments, charges, or the actual commission of a crime is not admissible as impeachment.  
People v. Triplett
, 108 Ill. 2d 463, 475, 485 N.E.2d 9, 15 (1985).  Therefore, the trial court properly ruled that the deceptive-practices charge for which the State witness received court supervision could not be used to impeach her credibility.

A witness cannot be impeached by a conviction if more than 10 years have elapsed since the date of the conviction or the date of release from confinement, whichever is later.  
People v. Montgomery
, 47 Ill. 2d 510, 516, 268 N.E.2d 695, 698 (1971).  Accordingly, evidence of a 1986 conviction for car theft would have been admissible at Nitz's first trial for purposes of impeachment.  Since it would have been admissible at the first trial, it could have been used to impeach at the second trial, even though the 
Montgomery
 time frame had elapsed.  See 
People v. Reddick
, 123 Ill. 2d 184, 203, 526 N.E.2d 141, 149 (1988).  The State concedes this point.

However, the law does not require that all convictions within the 10-year period be automatically admitted for purposes of impeachment.  The 10-year rule is merely meant to impose an outer limit upon the judge's determination.  It does not restrict a decision to bar evidence of a prior conviction that falls within that 10-year period.  
Montgomery
, 47 Ill. 2d at 519, 268 N.E.2d at 700.  Broad discretion is vested in the trial court in evaluating the admissibility of this type of evidence.  
Reddick
, 123 Ill. 2d at 203, 526 N.E.2d at 149.  We note only that the 10-year 
Montgomery
 rule cannot be used to exclude the evidence.  See 
Reddick
, 123 Ill. 2d at 203, 526 N.E.2d at 149.  

The 
Montgomery
 rule requires the court to balance the probative value of the evidence against the danger of unfair prejudice.  
People v. Walker
, 157 Ill. App. 3d 133, 137, 510 N.E.2d 29, 32 (1987).  The unfair prejudice that the 
Montgomery
 court had in mind was the danger inherent in any admission of evidence of a defendant's criminal history.  The rule's concern is over the potential misuse of that evidence, a concern that jurors would consider it as proof of criminal propensity rather than confining their use of it to the question of a testifying defendant's credibility.  When a witness, rather than an accused, is impeached with a prior conviction, the jury cannot use evidence of the prior conviction for any purpose other than that for which it was intended, 
i.e.
, to question that witness's credibility.  
Walker
, 157 Ill. App. 3d at 137, 510 N.E.2d at 32.  The introduction of evidence of a witness's prior conviction is incapable of producing unfair prejudice, since the witness cannot be convicted of anything based upon the jury's knowledge of his prior criminal history.  
Walker
, 157 Ill. App. 3d at 138, 510 N.E.2d at 32.  It is difficult to conceive of a case in which the danger of unfair prejudice to the prosecution could substantially outweigh the probative value of evidence that a witness had been convicted of felonies or crimes involving dishonesty.  
Walker
, 157 Ill. App. 3d at 138, 510 N.E.2d at 32.  Here, the prior conviction could have been considered by the jury only insofar as it related to the witness's credibility.  In our judgment, it was wrong to exclude it.

However, we do not think that the error is of a nature that warrants a reversal and a new trial.  Evidentiary errors are harmless if properly admitted evidence overwhelmingly supports a defendant's guilt.  
Reid
, 179 Ill. 2d at 314, 688 N.E.2d at 1164.  Even if Nitz had been able to impeach the witness with his prior conviction and the jury thereafter deemed the testimony less credible, there were other State witnesses that offered the same information.  Accordingly, we find that the error was harmless.  

Finally, Nitz wants us to reverse his life sentence of imprisonment.  He first argues that the trial judge erroneously found that his conduct was brutal and heinous behavior indicative of wanton cruelty.

Our colleagues have attempted to refine what the words "brutal" and "heinous" mean.  Heinous conduct has been called " ' " 'hatefully or shockingly evil' " ' " and " ' " 'grossly bad' " ' " conduct.  
People v. Nielson
, 187 Ill. 2d 271, 299, 718 N.E.2d 131, 148 (1999) (quoting 
People v. Lucas
, 132 Ill. 2d 399, 445, 548 N.E.2d 1003, 1022 (1989) (quoting 
People v. La Pointe
, 88 Ill. 2d 482, 501, 431 N.E.2d 344, 353 (1981) (quoting Webster's Third New International Dictionary 1050 (1971)))).  Brutal conduct has been called " ' " 'grossly ruthless,' " ' " " ' " 'devoid of mercy or compassion,' " ' " and " ' " 'cruel and cold-blooded.' " ' "  
Nielson
, 187 Ill. 2d at 299, 718 N.E.2d at 148 (quoting 
Lucas
, 132 Ill. 2d at 445, 548 N.E.2d at 1022 (quoting 
La Pointe
, 88 Ill. 2d at 501, 431 N.E.2d at 353 (quoting Webster's Third New International Dictionary 286 (1971)))).  We find no need to elaborate on what the words "brutal" and "heinous" mean. 

We are mindful of the fact that it is hard to find a murder that does not possess some element of brutality, does not appear heinous in nature, and could not be said to show a degree of wanton cruelty to one's fellow man.  Yet, certain murders tend to stand apart from others when we think of these terms.  

Nitz repeatedly inflicted blows to the head of a downed and defenseless Miley, blows administered with a baseball bat.  An eyewitness estimated that he may have taken as many as 20 swings.  Nitz then stuffed Miley's body into the trunk of his car.  He drove Miley to a remote destination, opened the trunk, and fired a bullet into Miley's head.  To hamper future investigation and conceal his foul deeds, he severed the head from Miley's body and disposed of it in parts unknown. 

When we think of what Louisville Slugger can do with a piece of white ash and we envision it employed as a weapon aimed at the skull of a listless young man, we might wonder about the bloody sight that it could produce and the degree of pain that it must have inflicted.  We might wonder how Nitz managed to fight fatigue, having repeatedly ripped at Miley's head.  We might wonder whether the badly beaten young man was still conscious when Nitz stuffed him into the trunk, whether he gasped for his last breaths of air while entombed in those surroundings, whether he felt relieved when the trunk opened and fresh air hit his lungs, and whether he knew his final moment was at hand when he saw the gun trained at his head.  While we might further ponder where the head of Michael Miley has come to rest, there is one thing over which we need not speculate–whether this killing was accompanied by brutal and heinous behavior indicative of wanton cruelty.  We find no abuse of discretion in the trial judge's finding.

Nitz's second attack on the life-imprisonment sentence points to mitigation evidence that failed to sway the trial judge from imposing the harshest sentence available in this case.  The trial judge considered the mitigating evidence but rejected it, finding that Nitz lacked sufficient rehabilitative potential to warrant a mitigated sentence.  Thus, the judge did not veer from his judgment that Nitz should receive the most severe punishment at hand, despite hearing evidence that Nitz had been emotionally and physically abused as a child, suffered from mild frontal-lobe brain damage, and had demonstrated finer human qualities at certain times during his life.  It was within the trial judge's discretion to allow the seriousness of the offense to guide his decision in finding the proper punishment to impose.  His rejection of the factors in mitigation was not an abuse of discretion.

Nitz's last assault on his sentence asks for a determination of whether the statutory mechanism for the imposition of his life sentence deprived him of the right to have a jury determine those facts that set his limit of exposure to maximum punishment.  The constitutional challenge focuses on the manner in which our law 
used 
to allow sentencing judges to impose natural-life prison terms.  The first-degree-murder sentencing statute employed in meting out Nitz's sentence increased the maximum penalty that could be imposed, based upon a judge's determination that the killing had been accompanied by brutal or heinous behavior indicative of wanton cruelty.  Life imprisonment, as opposed to a maximum prison term of 60 years, could be imposed if, but only if, a judge first found that the murder had been accompanied by other brutal or heinous behavior.  Nitz asks us to examine his life sentence in light of 
Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), a case in which the United States Supreme Court held a New Jersey hate-crime statute unconstitutional because it commissioned judges to make a factual finding that enhanced their power to punish beyond the maximum penalties prescribed for those factual determinations underlying jury verdicts. 

This is an issue that we decided in Nitz's favor on March 28, 2001, before a number of statutory changes by our legislature and before a number of higher court decisions that have continued to define the fundamental nature of the constitutional rule promulgated in 
Apprendi v. New Jersey
.  Our earlier decision was vacated pursuant to a supervisory order issued by the Illinois Supreme Court on December 3, 2003.  
People v. Nitz
, 206 Ill. 2d 637, 799 N.E.2d 675 (2003).  Pursuant to that order and a subsequent supervisory order entered on May 26, 2004 (
People v. Nitz
, 209 Ill. 2d 594, 808 N.E.2d 1008 (2004)), an order received and filed by us on June 21, 2004, we revisit the question of Nitz's punishment.   

We earlier determined that the procedure employed in sentencing Nitz to life imprisonment violated his constitutional right to a trial by jury, because a judge, rather than a jury convinced beyond a reasonable doubt, had determined the fact that authorized the punishment.  We reduced the sentence to the harshest sentence the sentencing judge could have imposed based upon those facts that composed the guilty verdict returned by the defendant's jury.   Thus, Nitz's punishment decreased from a lifelong sentence with no possibility of supervised release to a determinate prison term of 60 years.  
People v. Nitz
, 319 Ill. App. 3d 949, 747 N.E.2d 38 (2001).

Since our earlier opinion, the Illinois Supreme Court has confirmed that the sentencing scheme under which Nitz was sentenced violates a defendant's right to a trial by jury.  
People v. Swift
, 202 Ill. 2d 378, 383, 781 N.E.2d 292, 295 (2002).  With all that has now been written about 
Apprendi
's constitutional rule, we find further in-depth discussion of the constitutional infirmity unnecessary.  Suffice it to say that the sentencing judge in this case determined a fact that had not been submitted to the jury–that this murder, as opposed to other first-degree murders, had been accompanied by exceptionally brutal and heinous conduct indicative of wanton cruelty.  Based upon that finding of fact, rather than a jury's determination of that fact beyond a reasonable doubt, the defendant's punishment was increased from 60 years of imprisonment to imprisonment for life's duration.  The increase unquestionably violated the constitutional right to have a jury determine those facts that determine the maximum sentence that the law will allow.  See 
Apprendi
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348; 
Ring v. Arizona
, 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002); 
Blakely v. Washington
, 542 U.S. ___, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004).

This finding of constitutional error does not end our inquiry.  The Illinois Supreme Court has held that defendants are not necessarily entitled to punishments determined in a constitutional manner.  See 
Swift
, 202 Ill. 2d 378, 781 N.E.2d 292.  The supreme court entered its two supervisory orders requiring us to reexamine the question of Nitz's life sentence, even though it recognizes that the punishment was imposed in an unconstitutional way.    

Even though Nitz's punishment violates his constitutional guarantee to have a jury decide all the facts necessary for that punishment's imposition, Nitz can still be made to expiate his crime by serving a life prison term.  The supreme court has empowered us to find that no harm was done in failing to obtain the finding necessary to impose life imprisonment from the jury selected to determine Nitz's guilt.  We can find harmless error in the imposition of more severe punishment than the jury's actual verdict would allow.

In 
People v. Thurow
, 203 Ill. 2d 352, 786 N.E.2d 1019 (2003), the Illinois Supreme Court delegated to appellate judges the power to examine evidence that the State had presented during a defendant's trial and to determine from that examination whether a jury would have found the enhancing fact beyond a reasonable doubt, had the jury been asked to decide its existence.  Our high court has authorized us to determine an element upon which Nitz's sentence rests.  We have been ordered to decide whether the evidence presented would have convinced the defendant's 12 jurors beyond a reasonable doubt that Michael Miley's murder was accompanied by brutal behavior indicative of wanton cruelty.  The imposition of Nitz's enhanced sentence can constitute harmless constitutional error, provided that we are able to discern from the record what Nitz's jury would have decided, had it been afforded the opportunity to decide.  See 
Thurow
, 203 Ill. 2d 352, 786 N.E.2d 1019; 
People v. Crespo
, 203 Ill. 2d 335, 788 N.E.2d 1117 (2001); 
Swift
, 202 Ill. 2d 378, 781 N.E.2d 292.  In effect, we, rather than Nitz's jury, have been entrusted to determine Nitz's guilt with regard to one element of Nitz's criminal behavior.  

On December 3, 2003, we were ordered to vacate our March 28, 2001, opinion and to determine whether the imposition of Nitz's enhanced penalty constituted harmless error.  
People v. Nitz
, 206 Ill. 2d 637, 799 N.E.2d 675 (2003).  Earlier this year, we reexamined the evidence of the behavior that accompanied Nitz's killing of Michael Miley.  On March 5, 2004, we decided that 
a jury 
would have unanimously decided beyond a reasonable doubt, had it been asked to do so, that the murder of Michael Miley was accompanied by brutal behavior indicative of wanton cruelty.  
People v. Nitz
, No. 5-98-0657 (2004) (unpublished order under Supreme Court Rule 23).  Complying with the December supervisory order, we held that Nitz's natural-life sentence could stand.  We found that the constitutional error in the manner in which the sentence had been imposed constituted harmless error.  

On May 26, 2004, the Illinois Supreme Court issued a second supervisory order, directing us to vacate our March 5, 2004, Rule 23 order.  
People v. Nitz
, 209 Ill. 2d 594, 808 N.E.2d 1008 (2004).  We received and filed that order on June 21, 2004.  

The second supervisory order told us to enter a new published opinion or Rule 23 order disposing of all the issues raised in this appeal.  The second supervisory order proved necessary because we had failed to include the other questions raised and earlier addressed in our March 28, 2001, opinion when we filed our new decision on Nitz's punishment.  Our entire earlier opinion was vacated pursuant to the December 3, 2003, supervisory order.  Therefore, issues other than the validity of Nitz's punishment remained unaddressed when the new decision finding harmless constitutional error was filed.  

Before we could refile a decision that addressed all the issues raised in this appeal, and thereby comply with the second supervisory order, the United States Supreme Court handed down its decision in 
Blakely v. Washington
, 542 U.S. ___, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004).  It seems apparent from that June 24, 2004, Supreme Court opinion that any imposed punishment harsher than the maximum punishment that could be imposed upon the factual determinations reflected in a jury's verdict constitutes structural constitutional error.  If that error is structural, which the most recent United States Supreme Court pronouncement on the right to a trial by jury suggests, the constitutional error committed in this case cannot be deemed harmless.  See 
Sullivan v. Louisiana
, 508 U.S. 275, 279, 124 L. Ed. 2d 182, 189, 113 S. Ct. 2078, 2081 (1993).

We now examine the question of whether the methodology we are directed to employ meets with the view from the top–whether harmless error analysis comports with the sixth amendment right to a trial by jury as seen through the eyes of the five United States Supreme Court justices who compose the 
Blakely
 majority.  In 
Blakely v. Washington
, the Supreme Court found that Blakely's sentence, imposed upon a negotiated plea of guilty, was unconstitutional.  
Blakely
, 542 U.S. at ___, 159 L. Ed. 2d at 415, 124 S. Ct. at 2538.  Under Washington sentencing laws, the maximum punishment for the facts to which Blakely pled was 53 months of imprisonment, even though the prescribed statutory maximum sentence for the pled-to crime was 10 years.  
Blakely
, 542 U.S. at ___, 159 L. Ed. 2d at 411, 124 S. Ct. at 2535.  The sentencing judge employed a departure mechanism contained in Washington's sentencing statute in order to enhance Blakely's prison term to 90 months–37 months more than the maximum penalty that could be imposed on the facts reflected in the defendant's admissions, yet 30 months less than the prescribed statutory maximum penalty for the defendant's crime.  The sentencing judge found that Blakely had acted with deliberate cruelty, and based upon that finding, the judge enhanced Blakely's sentence.  Clearly, the sentencing judge had not exceeded the prescribed statutory maximum penalty by virtue of the enhancement. 

Holding that what had happened violated the sixth amendment, Justice Scalia wrote for the majority: 

"[T]he 'statutory maximum' for 
Apprendi 
purposes is the maximum sentence a judge may impose 
solely on the basis of the facts reflected in the jury verdict or admitted by the defendant
.  See 
Ring
, 
supra
, at 602[, 153 L. Ed. 2d at 572, 122 S. Ct. at 2440] (' "the maximum he would receive if punished according to the facts reflected in the jury verdict alone" ' (quoting 
Apprendi
, 
supra
, at 483[, 147 L. Ed. 2d at 450, 120 S. Ct. at 2359])); [citations].  In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose 
without
 any additional findings.  When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment' [citation] and the judge exceeds his proper authority."  (Emphasis in original.)  
Blakely
, 542 U.S. at ___, 159 L. Ed. 2d at 413-14, 124 S. Ct. at 2537.

Justice Scalia went on to underscore the fact that punishments inflicted without a jury's factual underpinning would offend the Constitution's fundamental structure.  He wrote:

"Our commitment to 
Apprendi 
in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial.  That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure.  Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary.  [Citations.]  
Apprendi
 carries out this design by ensuring that the judge's authority to sentence derives wholly from the jury's verdict.  Without that restriction, the jury would not exercise the control that the Framers intended.  

* * *

***  There is not one shred of doubt *** about the Framers' paradigm for criminal justice: not the civil-law ideal of administrative perfection, but the common-law ideal of limited state power accomplished by strict division of authority between judge and jury.  
As Apprendi held, 
every defendant has the 
right 
to insist that the prosecutor 
prove to a jury all facts legally essential to the punishment
."  (Emphasis added and in original.)  
Blakely
, 542 U.S. at ___, 159 L. Ed. 2d at 415-20, 124 S. Ct. at 2538-43.

These views are remarkably similar to observations made in a dissent that Justice Scalia had penned five years earlier.  Three of the four other justices who compose the 
Blakely
 majority agreed with the conclusion reached by that dissent.  They felt that a failure to submit each and every element of a charged offense for jury determination beyond a reasonable doubt could never constitute harmless error.  
Neder v. United States
, 527 U.S. 1, 25, 30, 144 L. Ed. 2d 35, 57, 60, 119 S. Ct. 1827, 1842, 1844 (1999) (Stevens, J., concurring; Scalia, J., concurring in part and dissenting in part, joined by Souter and Ginsburg, JJ.).  Justices Scalia, Souter, Ginsburg, and Stevens believed that the error had to be structural error.  

People v. Thurow
, the genesis of the harmless error analysis that we have been ordered to apply in this case, discusses the obvious tension between a review of 
Apprendi
 violations for harmless error and the holding reached in 
Apprendi
.  

"The essence of the holding in 
Apprendi 
is that it is unconstitutional for a judge and not a jury to make a factual finding that increases the penalty for a crime beyond the prescribed statutory maximum.  Yet in applying harmless-error analysis here, *** we, as judges, are making the factual determination ***.  Moreover, we are in a sense adding error upon error by repeating the violation committed by the trial judge, who made the original, erroneous determination.  See 
Neder
, 527 U.S. at 32, 144 L. Ed. 2d at 61, 119 S. Ct. at 1845 (Scalia, J., concurring in part and dissenting in part, joined by Souter and Ginsburg, JJ.) ('The Court's decision today [in 
Neder
] is the only instance I know of (or could conceive of) in which the remedy for a constitutional violation by a trial judge (making the determination of criminal guilt reserved to the jury) is a repetition of the same constitutional violation by the appellate court (making the determination of criminal guilt reserved to the jury)').  Strict adherence to the 
Apprendi
 rule here would avoid this situation[] and would honor 
the 'surpassing[ly] importan[t]' constitutional protections that entitle a criminal defendant to ' "a  jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." '  [Citations.]"  
Thurow
, 203 Ill. 2d at 369-70, 786 N.E.2d at 1029.

Despite a clear recognition that appellate judge fact-finding in order to uphold unconstitutional sentencing judge fact-finding seemed incongruous, the 
Thurow 
majority adhered to a 1999 United States Supreme Court opinion that is impossible to reconcile with the rule enunciated one year later in 
Apprendi v. New Jersey
.  In 
Neder v. United States
, a five-justice majority of the United States Supreme Court held that the failure to submit one element of a crime for a jury determination constituted harmless error, given the overwhelming evidence presented to support that part of the offense.  In 
People v. Thurow
, after recognizing the apparent incompatibility between the 
Apprendi
 holding and the 
Neder
 ruling one year earlier, Chief Justice McMorrow wrote:

"Nevertheless, the decision in 
Neder 
says what it says, and absent a Supreme Court holding to the contrary, we are bound to follow 
Neder
."  
Thurow
, 203 Ill. 2d at 371, 786 N.E.2d at 1029.

It seems increasingly clear that the views expressed by Justice Scalia in 
Neder v. United States
 are beliefs now shared by four other justices–Justices Souter, Ginsburg, and Stevens, all of whom departed from the majority opinion in 
Neder v. United States
, and Justice Clarence Thomas, who in 1999 sided with the 
Neder 
majority.  The 
Neder
 majority seems to have become a four-justice dissenting minority.  See 
Apprendi
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348; 
Blakely
, 542 U.S. ___, 159 L. Ed. 2d 403, 124 S. Ct. 2531.

At some time between June 10, 1999, the date on which 
Neder v. United States
 was decided, and June 26, 2000, the date on which 
Apprendi v. New Jersey
 was handed down, Justice Thomas changed his opinion about the right to have a jury decide all the facts necessary for the imposition of punishment.  Indeed, Thomas wrote a 24-page special concurrence in 
Apprendi v. New Jersey
 to record his new outlook on the right to a trial by jury.  He conceded his past misunderstanding, expressed doubt about the correctness of earlier Supreme Court opinions based upon his newly acquired viewpoint, and actually declared  that the right to jury fact-finding required a broader, more all-encompassing rule than the one adopted in Justice Stevens' majority opinion.  
Apprendi
, 530 U.S. at 499-523, 147 L. Ed. 2d at 460-75, 120 S. Ct. at 2367-80 (Thomas, J., concurring, joined in part by Scalia, J.).

A distinct, five-member majority of the United States Supreme Court has undeniably emerged in the five years since 
Neder v. United States
 was decided, a majority that has repeatedly, and consistently, taken measure of the sixth amendment's right to a trial by jury in a manner completely incompatible with the harmless error analysis contained in the 
Neder
 decision.  The four justices departing from the majority in 
Neder v. United States
 have now each authored a majority opinion that belies the logic that led to the 
Neder
 ruling.  
Jones v. United States
, 526 U.S. 227, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999) (Justice Souter); 
Apprendi
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (Justice Stevens); 
Ring
, 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (Justice Ginsburg); 
Blakely
, 542 U.S. ___, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (Justice Scalia).  Justice Thomas has formed the majority, joining in each of the right-to-a-trial-by-jury decisions.  He has clearly abandoned the views expressed by his companions in 
Neder v. United States
.  See 
Apprendi
, 530 U.S. at 499-523, 147 L. Ed. 2d at 460-75, 120 S. Ct. at 2367-80 (Thomas, J., concurring, joined in part by Scalia, J.); 
Blakely
, 542 U.S. ___, 159 L. Ed. 2d 403, 124 S. Ct. 2531.  This five-member majority has provided "intelligible content to the right of jury trial."  
Blakely
, 542 U.S. at ___, 159 L. Ed. 2d at 415, 124 S. Ct. at 2538.  As Justice Scalia put it in his 
Apprendi
 special concurrence, our Founding Fathers reserved the right, lost for a time in decisions like 
Walton v. Arizona
, 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990), and 
Neder v. United States
, 527 U.S. 1, 144 L. Ed. 2d 35, 119 S. Ct. 1827 (1999), but rediscovered in the new millennium, "to have a jury determine those facts that determine the maximum sentence the law allows."  
Apprendi
, 530 U.S. at 499, 147 L. Ed. 2d at 460, 120 S. Ct. at 2367 (Scalia, J., concurring).

Because Justice Scalia's view of the right to a trial by jury has prevailed ever since 
Neder v. United States
 was decided, because passages of the majority opinion in 
Blakely v. Washington
 clearly suggest that punishment in excess of the punishment that the jury's verdict would allow
 is a structural constitutional flaw, incapable of being considered harmless, and because those passages are completely incompatible with us making a factual finding necessary to punishment's imposition, we turn to Justice Scalia's dissent in 
Neder v. United States
 for a better understanding of the majority opinion that Scalia authored in 
Blakely v. Washington. 
 If that dissent now represents the view of five members of the United States Supreme Court, which 
Blakely v. Washington
 seems to indicate, the precedent established in 
Neder v. United States
, precedent that sanctions appellate courts to make factual determinations that juries should have made, but did not, and precedent relied upon by the Illinois Supreme Court in deciding 
People v. Thurow
, is no longer viable.   

In 
Neder v. United States
, Justice Scalia called the right to a trial by jury the "spinal column of American democracy."  
Neder
, 527 U.S. at 30, 144 L. Ed. 2d at 60, 119 S. Ct. at 1844 (Scalia, J., concurring in part and dissenting in part, joined by Souter and Ginsburg, JJ.).  He pointed out that it was a right contained in the constitution of every state to enter the Union and that it was the only civil liberty mentioned in the body of the United States Constitution as well as the Bill of Rights.  Justice Scalia called the right to counsel a "Johnny-come-lately," compared to the right to a trial by jury, and questioned how a deprivation of the jury-trial right could be deemed harmless when a deprivation of the right to counsel was deemed structural.

In his 
Neder
 dissent Scalia wrote words instructive to the meaning of what he later penned in 
Blakely v. Washington
:

"Even if we allowed (as we do not) other structural errors in criminal trials to be pronounced 'harmless' by judges[,] *** it is obvious that we could not allow judges to validate 
this
 one.  The constitutionally required step that was omitted here is distinctive, in that the basis for it is precisely that, absent voluntary waiver of the jury right,
 the Constitution does not trust judges to make determinations of criminal guilt
.  ***  And so the people reserved the function of determining criminal guilt 
to themselves
, sitting as jurors.  It is not within the power of us Justices to cancel that reservation–neither by permitting trial judges to determine the guilt of a defendant who has not waived the jury right, nor (when a trial judge has done so anyway) by reviewing the facts ourselves and pronouncing the defendant without-a-doubt guilty.  ***

* * *

*** [I]f permitting speculation on whether a jury would have changed its verdict logically demands permitting speculation on what verdict a jury would have rendered[,] we ought to be able to uphold directed verdicts in cases where the defendant's guilt is absolutely clear.  In other words, the Court's analysis is simply a repudiation of the principle that depriving the criminal defendant of a jury verdict is 
structural error
.  
Sullivan v. Louisiana
 clearly articulated the line between permissible and impermissible speculation that preserves the well-established structural character of the jury-trial right and places a principled and discernible limitation upon judicial intervention ***.  [Citation.]  Harmless-error review applies only when the jury 
actually renders
 a verdict–that is, when it has found the defendant guilty of all the elements of the crime.  

The difference between speculation directed toward 
confirming
 the jury's verdict (
Sullivan
) and speculation directed toward 
making a judgment that the jury has never made
 (today's decision) is more than semantic.  ***

***  The right to render the verdict in criminal prosecutions belongs exclusively to the jury; reviewing it belongs to the appellate court.  'Confirming' speculation does not disturb that allocation, but 'substituting' speculation does.  Make no mistake about the shift in standard: Whereas 
Sullivan 
confined appellate courts to their proper role of reviewing 
verdicts
, the Court today puts appellate courts in the business of reviewing the defendant's 
guilt
.  The Court does not–it 
cannot
–reconcile this new approach with the proposition that denial of the jury-trial right is structural error."  (Emphasis in original.)  
Neder
, 527 U.S. at 32-39, 144 L. Ed. 2d at 61-65, 119 S. Ct. at 1844-48 (Scalia, J., concurring in part and dissenting in part, joined by Souter and Ginsburg, JJ.).

There is no question where the author of 
Blakely v. Washington
 stands on the task we are directed to perform in this case.  Justice Scalia would never permit harmless error review of Nitz's guilt.  It is our belief that the other four members of the 
Blakely
 majority would join with him in that view.   

Clearly, the position taken by the United States Supreme Court in 
Blakely v. Washington
 simply does not square with the position taken by that Court in 
Neder v. United States
.  

The meaning of our Constitution's promise of a right to a trial by jury could not be more clearly stated than it was in 
Blakely v. Washington
: "As 
Apprendi
 held, every defendant has the 
right
 to insist that the prosecutor prove to a jury all facts legally essential to the punishment."  (Emphasis in original.)  
Blakely
, 542 U.S. at ___, 159 L. Ed. 2d at 420, 124 S. Ct. at 2543.  The four justices who departed from the majority opinion in 
Neder v. United States
, joined by an enlightened Clarence Thomas one year later in 
Apprendi v. New Jersey
, form a majority whose present-day thinking, evidenced in 
Blakely v. Washington
, embraces Scalia's comments in 
Neder v. United States
.  The same five-member majority would have to overrule 
Neder v. United States
 in order to maintain intellectual fidelity to the "intelligible content" it has now so plainly given the right to a trial by jury. 

While 
Blakely v. Washington
 further elucidates how difficult it is to reconcile harmless error analysis with the task of safeguarding the right to a trial by jury as defined by 
Apprendi v. New Jersey
 and its progeny, and while 
Blakely v. Washington
 further suggests that a punishment unsupported by jury fact-finding would be structurally flawed, a constitutional wrong incapable of harmless error review, the United States Supreme Court has not expressly overruled its decision in 
Neder v. United States
.  The absence of any mention of 
Neder v. United States
 in 
Apprendi v. New Jersey
, 
Ring v. Arizona
, or 
Blakely v. Washington
 requires us to rule contrary to what we think a majority of the United States Supreme Court would find constitutionally impermissible.  

The Illinois Supreme Court clearly recognized the incompatibility between the constitutional rule pronounced in 
Apprendi v. New Jersey
 and the decision in 
Neder v. United States
, when it decided 
People v. Thurow
.  Despite that awareness, our high court felt obliged to adhere to the earlier decision, because the United States Supreme Court had not addressed it when it decided 
Apprendi v. New Jersey
.  The Illinois Supreme Court determined that, in the absence of a United States Supreme Court opinion expressly overruling 
Neder v. United States
, it was bound to follow it. 

Under the doctrine of 
stare decisis
, when the Illinois Supreme Court has declared law on any point, only it can modify or overrule its previous opinion, and lower courts are bound by such decision.  
People v. Ladd
, 294 Ill. App. 3d 928, 937, 691 N.E.2d 896, 904 (1998).  
People v. Thurow
 declared that we can find harmless error in the absence of a jury finding to support Nitz's life sentence.  We have been ordered by our supreme court to reconsider our invalidation of Nitz's life sentence, in light of its decision in 
People v. Thurow
.  We must obey that charge, despite a serious doubt about the constitutional correctness of reviewing Nitz's punishment for harmless error.  We cannot overrule our supreme court.   

Thus, we confront a defendant who insists on a sentence based solely upon those facts that the prosecutor proved beyond a reasonable doubt to his jury–who insists upon the 
right
 to a jury trial as defined in 
Blakely v. Washington
.  Since the prosecutor did not prove, beyond a reasonable doubt, to Nitz's jury the fact upon which Nitz's life sentence rests, Nitz's sentence exceeds the punishment that is constitutionally permissible. 

Although we firmly believe that a majority of the justices on today's United States Supreme Court would never allow the harmless error analysis that we are about to engage in, that majority has remained silent about 
Neder v. United States
, the case upon which 
People v. Thurow
 rests.  The Illinois Supreme Court has declared that it is bound by the 
Neder
 decision in the absence of a United States Supreme Court opinion expressly overruling it.  

Given the position taken by our betters, we cannot forego a harmless error analysis.  
People v. Thurow
 says what it says, and absent an Illinois Supreme Court holding to the contrary or a United States Supreme Court decision that expressly overturns 
Neder v. United States
, we are bound to follow 
People v. Thurow
.

As we discussed earlier, the fact that this murder was accompanied by brutal behavior indicative of wanton cruelty seems rather obvious to us.  Indeed, we think that it was proven beyond a reasonable doubt that brutal behavior indicative of wanton cruelty accompanied the murder of Michael Miley.  In our judgment, Nitz is obviously, without a doubt, guilty of a brutal first-degree murder indicative of wanton cruelty.   

However, this is not the determination that we are required to make.  

In March, when we found the commission of harmless constitutional error in this case, we considered the evidence presented at Nitz's trial and decided, based upon that evidence, what a jury of 12 people would have unanimously found beyond a reasonable doubt, had they been allowed to decide: whether brutal behavior indicative of wanton cruelty had accompanied the killing of Michael Miley.  We did not focus upon Nitz's jury but, rather, considered what any rational jury of 12 people would have done, based upon the evidence presented, had they been afforded the opportunity.   

Upon further reflection, we do not think that a harmless error analysis of a person's guilt can be engaged in using an objective standard.  When we review jury verdicts for harmless error, we are reviewing what jurors who actually heard the evidence and returned a verdict would have done in the absence of the error.  When we review a defendant's guilt for harmless error, rather than that defendant's jury verdict, must we not decide what those jurors who actually heard his case would have unanimously decided beyond a reasonable doubt, had they been afforded the opportunity to decide his guilt?  As this case so graphically demonstrates, the standard that we apply can make a significant difference.

Nitz was constitutionally entitled to have each element of his guilt decided beyond a reasonable doubt by a 
jury of his choosing
.  The jury he selected to decide his fate did not decide it.  Before we deem a violation of the constitutional right to a trial by jury harmless, before we allow an unconstitutionally arrived-at punishment to be served, we must determine what Nitz's jury, not some hypothetical jury, would have decided had it been allowed to decide.  We must necessarily determine what those jurors whom Nitz selected to decide his guilt would have unanimously done with a verdict form that called for a finding of more serious guilt than the guilt defined by the three guilty verdict forms that they were actually provided.    

This case calls to mind Justice Scalia's observations about how the Framers of the Constitution envisioned our system of criminal justice.  It was never intended to be the model of perfection.  It was intended to reserve fact-finding and guilt determination in the people–the unwashed masses who lacked training and expertise in the law.  The Framers of the Constitution entrusted the determination of another citizen's guilt or innocence to the individual common sense and the collective wisdom of 12 people.  The Constitution does not trust judges to determine criminal guilt.   

We have no doubt about how Nitz's guilt would have been determined on the evidence presented, had his guilt been entirely our decision to make. 

We would have found Nitz without-a-doubt guilty of intentionally killing Michael Miley when he took point-blank aim, pulled the trigger, and planted a bullet into Miley's head.  But that is not what Nitz's jury decided.  For reasons not entirely clear to us, the jury found Nitz not guilty of intentionally killing Miley, and it acquitted him of first-degree murder as alleged in count I.  We would have found Nitz without-a-doubt guilty of shooting Miley in the head with the knowledge that the act would cause death.  But that is not what Nitz's jury decided.  His jury found that he did not act with that state of mind, and it acquitted him of first-degree murder as alleged in count II.  

The jurors selected to decide Nitz's guilt or innocence found him not guilty of shooting Michael Miley with the more egregious criminal states of mind that can accompany a killing.  They found Nitz guilty of killing Miley  while acting with a state of mind generally deemed the least culpable
 mens rea
 to accompany murderous acts that cause another person's death.

The question mounts whether the same jurors who acquitted Nitz of two of the more reprehensible murder counts would have unanimously decided beyond a reasonable doubt that brutal or heinous behavior indicative of wanton cruelty accompanied the killing.  We cannot say.

We have already decided that the affidavit of juror Davis cannot impeach the verdict reached.  However, we need not ignore that affidavit when the inquiry turns to speculation over what Nitz's jurors would have done if asked to decide whether Nitz had committed more detestable criminal conduct than the conduct defined in the three guilty verdict forms that those jurors possessed.    

The deliberations to verdict were undeniably long.  It is clear that Nitz's jury could not reach a consensus on his guilt or innocence, despite a great effort to do so.  The jurors announced in open court, more than once, that they were hopelessly deadlocked. 

According to juror Davis's affidavit, four jurors did not think that the State had proven any kind of guilt beyond a reasonable doubt.  The four jurors were "holding out" for either an outright acquittal or a mistrial.  The affidavit appears to be corroborated.  Defense counsel made note in the record, without objection, that four of the defendant's jurors openly wept when they entered the courtroom with the guilty verdict. 

Nitz's jurors apparently reached a successful compromise, resulting in the guilty verdict that was returned. The jurors apparently agreed to acquit Nitz of what looked like the more reprehensible murder counts, while further agreeing to find him guilty of what they believed was a less serious form of murder.  This apparent compromise was fueled by the mistaken belief that committing the acts that caused the death with a less culpable state of mind would diminish the degree of punishment.  The chief claim in juror Davis's affidavit is instructive.  She claims under oath that she would never have voted for a guilty verdict if she had not been persuaded by other jurors that Nitz's punishment for the verdict form that she agreed to sign would be time served.  According to juror Davis, she misapprehended the consequences of her vote.  She thought the verdict reflected a lesser degree of guilt that carried lesser punishment.  

We seriously doubt that jurors could have persuaded juror Davis to sign a verdict form finding the defendant guilty of brutal or heinous behavior indicative of wanton cruelty, by maintaining a position that such a verdict would entitle Nitz to lenity when it became time to impose punishment.  It is difficult to imagine that four jurors who, for hours on end, stood firm in refusing to find Nitz guilty of anything would have relented, abandoning their convictions, by signing a verdict form that defined more egregious conduct than the verdict forms that they possessed. 

Because we cannot say that the constitutional error in this case was harmless beyond a reasonable doubt, we  find that Nitz does not have to serve an unconstitutional punishment.  We fix punishment at the maximum sentence  that can be imposed upon the facts reflected in the jury's guilty verdict.  The defendant is sentenced to the custody of the Illinois Department of Corrections for a period of 60 years.   

Affirmed as modified.   

WELCH and GOLDENHERSH, JJ., concur.

COMMENTS AND ANNOTATIONS
Text Box 1:

TEXT BOXES
NOTICE

Decision filed 11/10/04.  The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.